**UNEMPLOYED WORKERS UNION et al.**

v.

**Mary C. HACKETT, Individually and as Director of the Rhode Island Department of Employment Security.**

**Civ. A. No. 4713.**

United States District Court,
D. Rhode Island.

Oct. 20, 1971.

☞90

Cary J. Coen, and John M. Roney, of R. I. Legal Services, Inc., Providence, R. I., for plaintiffs.

Charles H. McLaughlin, Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

Plaintiffs, members of the Unemployed Workers Union (hereinafter sometimes referred to as U.W.U.), quietly and individually approached persons waiting either in line or seated in a Rhode Island Department of Employment Security (hereinafter sometimes referred to as D.E.S.) office with conversation and fliers about the purpose of their organization and its next meeting date. They did not obstruct traffic or interfere with the conduct of the Department's business. Within three minutes of their entry into the building, the local manager of the D.E.S. office, accompanied by a policeman, told plaintiffs that fliers were not permitted to be distributed in the building and asked them to leave. Plaintiffs left the building and have now come to this Court for assistance in enforcement of their First Amendment rights.

The Unemployed Workers Union, an unincorporated association, and certain named plaintiffs, on behalf of themselves and as representatives of the class of members of the U.W.U. seek injunctive and declaratory relief as authorized by 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202. Jurisdiction of this Court is based on 28 U.S.C. §§ 1343(3) and 1343(4).

The plaintiffs attack the policy of the named defendant, individually and as Director of the Rhode Island Department of Employment Security, of prohibiting them from speaking with and distributing literature or printed material to unemployed workers in the Rhode Island Department of Employment Security Office at Mason and West Exchange Streets, Providence.

The Unemployed Workers Union is an association of approximately 100 members that was organized on August 30, 1971. Among its goals is making the public and unemployed workers aware of rights and benefits under Rhode Island General Laws § 28–42–2 et seq. Information is given about food stamp and welfare benefits as well as about unemployment compensation. The organization seeks to secure "more adequate benefits." By this the Union means a campaign to have the unemployment benefit period in this State extended from 39 to 52 weeks and to have Rhode Island provide benefits for up to eight dependents rather than the current maximum of four dependents. Massachusetts and Connecticut, plaintiffs contend, provide both the 52-week period and an eight dependent maximum. The Union also states as its goal making the administration of Department of Employment Security programs more equitable. The Union attempts to program weekly meetings to inform people of their rights and has prepared pamphlets and an unemployed worker's handbook. They have also scheduled a conference for late October.

On September 2, 1971, plaintiffs met with defendant to discuss an unemployed workers "Bill of Rights." Point 5 of the "Bill of Rights" was the only point on which there was disagreement and involved the right of Union members to enter the building and engage in consensual conversation with and hand leaflets to those applicants or recipients not being attended to by a clerk. They explained that they would wear U.W.U. buttons so as not to be identified as D.E.S. employees and that they would clean up any dropped leaflets. On September 7, 1971 the Union received a letter from Miss Hackett, denying their Point 5 on the ground that it would interfere with the D.E.S. carrying out its mandate of providing services to unemployed workers.

The D.E.S. office has three entrances, two from Mason Street and one on West Exchange Street, and is basically a very large long room, of 20,000 square feet that is separated by a middle counter. The Mason Street side of the building is where application for benefits is made and the West Exchange Street side is where recipients pick up their compensation. Witness Hazard, who had been to the office to receive benefits twenty-four times in the past, testified that there were usually several lines to the counters with five–fifteen people per line. On an average Wednesday afternoon, he testified, he would find forty to fifty people waiting in lines. The average wait in line was fifteen minutes and people talked, or read, or just stood and waited during that time.

On September 8, 1971, eight or nine members of the Union entered the D.E.S. office. They were in two groups of approximately four each and entered from two different doors, one group staying on the applicants' side of the building and one on the recipients' side. Plaintiff Levesque testified that he entered the West Exchange Street door and went to the last line, to the last person in line. As he conversed with the man who was last in line and asked him if he would like a flier, the man in front in line turned around and asked for a flier. The talking was in conversational tones. At that point two officers approached plaintiff and told him that he would have to leave, that leafleting in the building was not allowed. Plaintiff left the building immediately.

Plaintiff Arcuri testified that on that day he entered the office with the group and went directly to the chairs in the rear of the room. He introduced himself to a seated man and handed him a flier. As the man read the flier and before Arcuri received a reply to it, a policeman came and, according to Arcuri's testimony, in a loud voice told Arcuri he would have to leave. Arcuri testified there had been no obstruction of passage and no blockage of doors. He left immediately.

The fliers being handed out by plaintiffs identified the Unemployed Workers Union and gave its next meeting date.

Defendant Hackett testified that there is an official administrative policy against distribution of printed materials and solicitation of any kind in D.E.S. offices that is embodied in a D.E.S. policy manual. She stated that she forbade distribution of leaflets because it would hinder her in the efficient and proper administration of her duty. Her decision not to allow plaintiffs to enter the building to leaflet was based on both the policy and her own approval of the policy.

The manager of the D.E.S. office, who had asked plaintiffs to leave the building, testified that there was no loud or boisterous talking by plaintiffs. He testified that there was some commotion when he asked plaintiffs to leave in that people got out of line, interested in seeing what was happening.

### First Amendment Rights Generally

Defendant has attempted to prohibit plaintiffs from both peacefully speaking with and distributing printed material to waiting persons in the Employment Security Office. The First and Fourteenth Amendments protect both these forms of communication from suppression by officials who would, in the absence of a compelling State interest, sacrifice on the altar of bureaucratic efficiency the rights of the citizenry to speak, associate and petition their government for redress of grievances. It would be to sabotage the very purpose of the First Amendment to allow those in government to suppress peaceful speech that is intended to organize citizens who seek peaceful growth and change in governmental policies.

First, it is indisputable that the forms of communication employed here are within the ambit of First Amendment protection. In Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971), it was reaffirmed that

"the activity of peaceful pamphleteering is a form of communication protected by the First Amendment. E. g. Martin v. City of Struthers, 319 U.S. 141 [63 S.Ct. 862, 87 L.Ed. 1313] (1943); Schneider v. State, 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155] (1939); Lovell v. City of Griffin, 303 U.S. 444 [58 S.Ct. 666, 82 L.Ed. 949] (1938)."

Nor need this communication meet standards of acceptability in order to merit protection. The truth or validity of the publication, the intent of plaintiffs to influence respondent into action, the fact that plaintiffs' views may be offensive to some do not operate to deprive this communication of its constitutional protection. *Organization for a Better Austin, supra*, 402 U.S. at 415, 91 S.Ct. 1575, 29 L.Ed.2d 1. While it is true that this speech is designed to assist plaintiffs in organizing others to their cause, it is a thoughtless perversion to suggest that it therefore is "commercial speech" and under the doctrine of Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942) unprotected. See Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

Through the union of unemployed workers into an organizational structure, plaintiffs testified that they hope to make improvements in the unemployment compensation system by extending the term of benefits and increasing the limit on the number of dependents used to compute the amount of the benefits. Further, they hope to assist other recipients in understanding the system and assist applicants and recipients in obtaining benefits to which they are entitled. In order to achieve any of these goals, it is necessary for them to reach a wide audience of the unemployed.

The right of workers with common interests to associate to further those interests was affirmed in Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964):

"It cannot be seriously doubted that the First Amendment's guarantees of free speech, petition and assembly give * * * workers the right to gather together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them * * * statutory rights would be vain and futile if the workers could not talk together freely as to the best course to follow."

Id. at 5–6, 84 S.Ct. at 1116.

And, as recognized in NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), constitutional protection extends to cooperative organizational activity intended to promote social change by vindicating the rights of minority group members. Associational rights are not restricted to areas involving just clearly political speech. In finding that the First Amendment protected a union's hiring of an attorney to pursue State workman's compensation benefits for its members, the Supreme Court in United Mine Workers of America, District 12 v. Illinois State Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed. 2d 426 (1967) noted "[T]he First Amendment does not protect speech and assembly only to the extent it can be characterized as political." Of course, to the extent that plaintiffs seek to organize to lobby for changes in the unemployment compensation system, their speech is political.

While First Amendment rights are preferred rights, the exercise of these rights in public forums may be subject to reasonable regulation.

The interest of the State in conducting the functions of the D.E.S. office unhampered by interference must be considered. Weighing of the State's interest is mandated by language in Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965):

"The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any

public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order. * * The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminating application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection."

On this rationale, this Court must consider "the right of a State or municipality to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Cox, supra,* at 554, 85 S.Ct. at 464.

Vindication of Rhode Island's interest in the smooth functioning of the D.E.S. offices was sought through the official administrative policy prohibiting any and all handbilling within D.E.S. offices. It was because of the existence of this policy and its affirmation by defendant that plaintiffs were asked to leave the building. Plaintiffs had met with defendant on September 2, 1971, six days before they entered the D.E.S. building to talk with people and pass out leaflets. On September 2 plaintiffs asked permission to enter the building to leaflet and talk with persons who were at the end of the lines or sitting down and not being attended to by D.E.S. personnel. They explained that they would do their own janitorial work to clean up discarded leaflets. On September 7 plaintiffs received an answer from defendant in the form of a letter, in which defendant stated:

"I am mandated by Federal standards as well as our own State statutes to provide efficient and effective services for the public. In my opinion it is impossible to live up to this mandate and all it implies if such premises were allowed to be used for other than the stated purposes of the Employment Security Act. Accordingly, I could not sanction the utilization of these premises for the purposes you mentioned to me in our meeting."

There was no evidence that the Department had been disrupted by persons leafleting in the building in the past or that this regulation was drawn on the basis of such experience. Rather it appears that a blanket prohibition on leafleting was drawn in anticipation that should any leafleting occur, it would be disruptive.

It is axiomatic that although the exercise of First Amendment rights in public places may be regulated, this regulation must be precisely and narrowly drawn to vindicate the State's interest. Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Massachusetts Welfare Rights Organization v. Ott, 421 F.2d 525 (1st Cir. 1969). It is equally clear to me that I cannot say that the entrance of any and all leafleters into the D.E.S. building will cause substantial interference with legitimate State interests. See Jones v. Board of Regents of University of Arizona, 436 F.2d 618 (9th Cir. 1970). Thus the official "policy" proscribes forms of communication which are constitutionally protected as well as forms which are not. As applied to First Amendment activities it is overbroad.[1] Zwickler v. Koota, 389 U.S. 241,

---

1. I feel that application of the overbreadth doctrine is singularly appropriate in this situation. The determination of the constitutional status of expression in public forums depends upon ad hoc standards which involve inquiry into such factual variables as the degree of inconvenience to others, the amount of obstruction of normal activities, the level of noise, etc. This does not assist either the process of principled decision making nor the development of First Amendment theory. Further, we are concerned that such delegations of power to interfere with com-

88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Riseman v. School Committee of City of Quincy, 439 F.2d 148 (1st Cir. 1971). Because this case involves prior restraint on expression, it comes with a "heavy presumption" against its constitutional validity. Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). The official policy does not reflect any effort to minimize the adverse effect of prior restraint. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Further, this administrative policy, as it is applied to plaintiffs' activities, is in violation of the First Amendment. Defendant has not established that there was any interference with the normal conduct of business at the Department of Employment Security. The only evidence of any disruption of the normal flow of activity within the building was that when defendant's agents asked plaintiffs to leave the building, several people in line turned around to see what was happening. Unlike Massachusetts Welfare Rights Organization v. Ott, 421 F.2d 525 (1st Cir. 1969), plaintiffs did not attempt to force staff members to ·exercise their judgment under pressure. Neither D.E.S. employees nor claimants or applicants at the counters were approached.

 There is no evidence of plaintiffs having interfered with the work of the D.E.S. or with the rights of others in the building to be left alone.[2] Defendant's mere fear of disruption cannot be sufficient to justify prohibition of the exercise of free speech. Such shadowy

trepidations are antithetical to "this kind of openness * * * that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious society." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *Tinker* establishes that:

"[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.

\* \* \* \* \* \*

In order for the State * * * to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained."

393 U.S. at 509, 89 S.Ct. at 737.

Any wish of the D.E.S. to avoid the controversy about unemployment compensation regulations likely to ensue from plaintiffs' organizing campaign cannot be a constitutionally valid reason to prohibit expression of plaintiffs' views. There has been no showing that the presence of plaintiffs burdened the capacity of the room, interfered with the privacy

---

municative activities be precisely drafted so that the court may understand the legislative judgment made by the State about the necessity of this interference. See Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970).

2. At oral argument defendant suggested that there was interference with the right to privacy of those persons waiting to receive service in the building. Assuming arguendo (and it is far from clear) that defendant has standing to raise

such *jus tertii*, no facts have been established to support defendant's contention. Plaintiffs testified that all of their conversations were consensual and that had anyone objected to the conversation or the leaflet, such activity would have ceased. They also testified that no one objected. The uncontroverted testimony shows that the typical approach was for plaintiff to address the person as follows: "Good morning. I'm a member of the Unemployed Workers Union. Would you like a flier?"

of applicants who wished to talk with employees, or obstructed the office, as was the situation in LeClair v. O'Neil, 307 F.Supp. 621 (D.Mass.1969).

 In the absence of any showing of interference with or substantial disruption of D.E.S. activities, plaintiffs, individually and as a class,[3] are entitled to relief. Riseman v. School Committee of City of Quincy, 439 F.2d 148 (1st Cir. 1971).

*Department of Employment Security Office as a Public Forum*

 "Streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." Amalgamated Food Employees, etc. v. Logan Valley Plaza, 391 U.S. 308, 315, 88 S.Ct. 1601, 1607, 20 L.Ed.2d 603 (1968). The Department of Employment Security office is a public place to which there cannot be a complete prohibition on the exercise of First Amendment rights. Recognition of State office buildings as being within the scope of areas in which free speech may be exercised is a logical extension of the established doctrine of "public forums." Free speech has been protected in the streets, Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); in shopping centers, Amalgamated Food Employees, etc. v. Logan Valley Plaza, *supra*; in bus terminals, Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir. 1968); in school corridors, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); and in welfare offices, Massa-

chusetts Welfare Rights Organization v. Ott, 421 F.2d 525, 527 (1st Cir. 1969). Analysis of the "public forum" has focused on such factors as the type of communication involved, with demonstrations involving picketing and marching receiving less protection than "pure speech" involves. Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Here, the forms of communication employed by plaintiffs, conversation and the giving of leaflets, are not, as such, subject to a lesser degree of protection. Nor is this a situation involving such an inherently strong governmental interest, as the protection of the independence of the judiciary in Cox v. Louisiana, 379 U.S. 559 at 561–564, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), as to justify stringent restrictions on free expression. However, plaintiffs' expressive interests must be weighed against the right of the State to restrict demonstrations which substantially interfere with governmental operations or with the free flow of traffic. See Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773 (1967); Sedler, Review: The First Amendment in Theory and Practice, 80 Yale L.J. 1071, 1077–89 (1971).

 I find that the Department of Employment Security office is a public forum that is particularly appropriate for the expression of plaintiffs' views and that defendant may not absolutely prohibit plaintiffs' rights of free expression. The protections offered freedom of expression under the reasoning of Wolin v. Port of New York Authority, 2 Cir., 392 F.2d 83 (1968), seem to be at least the minimum required here. *Wolin* recognized a distinction between "places dedicated to public use where fundamental rights must be recognized and pro-

---

3. This action is properly maintained as a class action. I find that the class is so numerous that joinder of all members is impossible, that the questions of law and some questions of fact are common to all members of the class, that the claims of named plaintiffs are typical of the class and that the representatives have fairly and adequately protected the in-

terests of the class. Rule 23(a), Fed.R. Civ.P. Because this is a First Amendment claim attacking a policy prohibiting all distribution of leaflets, adjudication of the interest of individual members of the class would be dispositive of the interests of other members of the class.

tected and places essentially private when the owner's rights of property and privacy are superior." 392 F.2d at 88. There can be no question but that the D.E.S. office is dedicated to public use. While title to the property does not rest in the D.E.S., the lessor has foregone any meaningful claim of rights of privacy in the property. Finding that the place in question was available for public use, Wolin inquired further:

> "[D]oes the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance."

392 F.2d at 89.

*Wolin* rejected defendants' contention that the Terminal was "an inappropriate site for such activity because the interior of a building is not traditionally a place for exercise of First Amendment rights," Id. at 89, in favor of examination of the factors outlined above. Examining the D.E.S. office under such criteria, I find that the office is a large, open public space partially filled with unemployment applicants and recipients waiting in line to receive service or sitting down. The movement of the lines is not so rapid as to occupy the attention of those waiting, nor so slow as to afford those waiting time to accomplish much more than speaking with each other or silently waiting. There is little by way of privacy to those waiting other than the anomie of being one in a mass. Governmental business is not commenced until the applicant or recipient reaches the counter.

Unlike the terminal in *Wolin*, which can be characterized as a street with a roof on it, the D.E.S. office is not attendant with noisy, bustling crowds. Yet even more than in *Wolin*, the D.E.S. office is where the audience appropriate to the content of the communication could be found. "The propriety of a place for use as a public forum does turn on the relevance of the premises to the protest." *Wolin, supra,* 392 F.2d at 90. Nowhere else may persons who receive unemployment compensation be found for purposes of organizational activity.

While the D.E.S. office could hardly be characterized as a "public thoroughfare," a key concept in *Wolin,* I hesitate to condition the exercise of speech of this content on the finding of a public forum which can be likened to the public thoroughfares traditionally used for exercise of First Amendment rights. The speech involved here breaks out of traditional molds of political speech in that it involves attempts to associate recipients of unemployment compensation into an organizational structure that plaintiffs hope will effectively petition the State for changes in its unemployment compensation policies. In addition the speech seeks to inform the public at large of the issues being raised by the Unemployed Workers Union.

*The Function of the First Amendment, And "New Property" Rights*

■ One would have to breathe life into fossilized notions of property to seriously argue that eligible recipients do not have a right to receive unemployment compensation.[4] See Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). It has long been clear that

---

4. The theoretical bases for this concept of right to unemployment compensation were expressed well by Reich, The New Property, 73 Yale L.J. at 785–86 (1964):
 "The concept of right is most urgently needed with respect to benefits like unemployment compensation, public assistance, and old age insurance. These benefits are based upon a recognition that misfortune and deprivation are often caused by forces far beyond the control of the individual, such as technological change, variations in demand for goods, depressions, or wars. The aim of these benefits is to preserve the self-sufficiency of the individual, to rehabilitate him where necessary, and to allow him to be a valuable member of a family and a community; in theory they represent part of the individual's rightful share in the commonwealth. Only by making

receipt of such compensation cannot be made subject to unconstitutional conditions. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Syrek v. California Unemployment Ins. App. Bd., 54 Cal.2d 519, 7 Cal.Rptr. 97, 354 P.2d 625 (1960); Ault Unemployment Compensation Case, 398 Pa. 250, 157 A.2d 375 (1960). Certain protections flow from the statutory right of the eligible unemployed worker to receive benefits. California Dept. of Human Resources Development v. Java, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). Unemployment compensation law, at least on the federal level, Social Security Act, 49 Stat. 620, tit. III and IX, 42 U.S.C. §§ 501–503, 1101–1105, is predicated on the principle "that payments be made to an eligible claimant as a matter of right" and not of charity. See Note, Charity v. Social Insurance In Unemployment Compensation Laws, 73 Yale L.J. 357 (1963).[5]

Thus, in exercise of their First Amendment rights, plaintiffs stand in relation to the State not just as citizens engaged in political speech but also as recipients of the "new property," see Reich, The New Property, 73 Yale L.J. 733 (1964), who seek to associate and petition the State about their entitlements.[6] The relationship of plaintiffs to the State is easily analogized to the early relationship between workers attempting to unionize and industry. Strong parallels exist to Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), which extended First Amendment protection to labor picketers:

"In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Schneider v. State, 308 U.S. 147, 155, 162, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155. See Senn v. Tile Layers Union, 301 U.S. 468, 478, 57 S.Ct. 857, 862, 81 L.Ed. 1229. It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the present generation and of those yet unborn may depend on these matters and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing. The merest glance at State and Federal legislation on the subject demonstrates the force of the argument that labor relations are not matters of mere local or private concern. Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society. The issues raised by regulations such as are challenged here, infringing upon the right of employees effectively to inform the public of the facts of a labor dispute are part of this larger

such benefits into rights can the welfare state achieve its goal of providing a secure minimum basis for individual well-being and dignity in a society where each man cannot be wholly the master of his own destiny."

5. It should be noted in passing that strength is given to the right of plaintiffs to attempt to influence the allocation of compensation by the fact that such compensation is paid in part from taxes collected from them when they worked. Thus the dependence of the

recipient on this compensation is not entirely voluntary—his tax money is not available for private savings or investment.

6. The ensuing analysis is meant to point out the special functions served by the First Amendment in protecting this expression and to suggest that the presence of such special functions weights plaintiffs' side more heavily in an ad hoc balancing standard of review under the First Amendment.

problem. We concur in the observation of Mr. Justice Brandeis, speaking for the Court in Senn's case (301 U.S. at page 478, 57 S.Ct. at page 862, 81 L.Ed. 1229): 'Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute for freedom of speech is guaranteed by the Federal Constitution.'"

310 U.S. at 103, 60 S.Ct. at 744.

This "industrial society" is not unlike the "welfare state" of today and it follows that First Amendment rights have at least equal validity with all of society's inevitable resultant changes.

I cannot ignore the argument that:

"Large scale and pervasive government, operating on a new order of magnitude and function, poses greater and more subtle threats to individual rights. The government has become an overpowering antagonist in any clash between state and individual. The exercise of authority in many areas, imposing social controls which are acceptable in themselves, tends in actual operation also to circumscribe freedom of expression. Perhaps most important, the danger of distorting legitimate powers for illegitimate purposes has become acute."

Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. at 901–02.

The partial substitution of the government in place of private industry as the provider of livelihood should mean increased rather than diminished protection for the sort of expression plaintiffs here seek to communicate in order to offset the concomitant dependence of the individual on the State.[7] See *Reich, supra,* at 760–771. The freedom of the unemployed worker to express himself, to associate with others, and to petition the government about the making of decisions that affect his livelihood may counteract his increased dependence on the State and add to his self respect. Associations of "new property" recipients are more likely to insure the responsiveness of bureaucratic structures to both statutory objectives and needs of recipients than can individuals acting alone.

Freedom of discussion of public affairs in a democratic society serves the function both of being a necessary precondition for securing peaceful social change which brings with it other freedoms and of feeding back information to the government concerning the needs and wishes of its citizens. The Unemployed Workers Union seeks to organize both to petition the State government, thus providing informational input to the State government, and to change policies concerning unemployment compensation, to extend benefits which will help increase their freedom of action from financial restraints.

In addition, it would seem that intelligent criticism of our government and its social policies is an increasingly com-

---

7. Projections of this growing dependence and fear of criticizing the governmental hand that feeds is not restricted to those who receive government largesse by virtue of status rather than by contract or license. See J. K. Galbraith, The New Industrial State 397 (1967):

"It has always been imagined * * * that to associate all, or a large part, of economic activity with the state is to endanger freedom. The individual and his preferences, in one way or another, will be sacrificed to the needs and conveniences of the apparatus created ostensibly to serve him. As the industrial system evolves into a penumbra of the state, the question of its relation to liberty thus arises in urgent form. * * * The instinct which warns of dangers in this association of economic and public power is sound. * * * No modern head of the Ford Motor Company will ever react with the same pristine vigor to the presumed foolishness of Washington as did its founder. No head of Montgomery Ward will ever again breathe defiance of a President as did Sewell Avery. Manners may be involved. But it would also be conceded that 'too much is at stake.'"

plex task.[8] The complexity of the task is further magnified by the fact that it is the government which increasingly sponsors research and hires experts to develop social programs. The freedom of association safeguards the ability of citizens to band together and provide the resources necessary to develop areas of information and expertise with which to evaluate intelligently government policies. Further, it seems unlikely that any substantial independent information pools will grow without the presence of interest groups who have use for such information—that non-governmental information pools about unemployment compensation would grow absent interested groups of unemployment recipients.

■ I recognize the need to provide for reasonable accommodation of the State's interest in operation of its public office and so find that I must balance plaintiffs' and defendant's interests. Where, as here, plaintiffs' expression goes to their right to associate to petition the government for developments in social policy concerning "new property" that they obtain from the government, and where they peacefully seek to communicate their views where the only relevant audience can be reached, albeit that place is a public building, I find the balance to be in favor of plaintiffs. The reasons for this additional weight to plaintiffs' First Amendment interests have been discussed. In summary, they are that the government exercises increasing power and control as it provides job or legal status income to increasingly large segments of the population. Inher-

ent in this increasing power and control is both the possibility of a monopoly on knowledge as non-governmental individuals or groups find they lack the resources to undertake evaluation of complex economic and social patterns and the coercion implicit in the ability to cut off an individual's livelihood. Greater protection of the freedoms of expression by the judiciary is necessary to offset the uncritical dependence of individuals on the hand that feeds them. Association may now be a necessary first step toward development of understanding and critiques of current social thought.

For the above reasons, it is hereby ordered:

Mary C. Hackett, her agents, employees, servants, attorneys and all persons in active concert and participation with her are enjoined from refusing to allow plaintiffs and all other members of the Unemployed Workers Union to enter the Rhode Island Department of Employment Security office at Mason and West Exchange Streets, Providence, between 8:30 A.M. and 4:30 P.M. Monday through Friday to speak with other unemployed workers inside the building and to distribute literature or printed material.

The Department may draw up reasonable regulations in conformance with the conditions of the temporary restraining order issued September 28, 1971. It is, of course, assumed that plaintiffs' conduct will be limited to consensual, individual conversations with persons not being assisted by D.E.S. personnel at the

---

8. "Because political issues are more complex, more dependent on specific information not available to the general public, and more remote, public opinion has become more apathetic, less well informed, less focused on precise issues, and less confident. Hence, in mass democracy, public opinion has become more susceptible to manipulation. Frequently this manipulation tends to be demagogic in character, employing broad and often irrational appeals, utilizing slogans and myths, or evoking a scapegoat as an alternative to facing reality. Thus there is much greater need in a mass democracy for countervailing judicial power to protect non-conforming individuals and small minority groups, both in their relations with the legislature and the executive and in their participation in large voluntary associations. There is need also to make as effective as possible the efforts of those leadership groups that are committed to a system of individual rights, whose main weapons are found in an appeal to rational principle and the force of law." Emerson, *supra*, 72 Yale L.J. at 902.

counters and that plaintiffs will clean up all littered leaflets. The motion for preliminary injunctive relief is granted pending entry of final judgment.