Sister Mary **REILLY** et al., Plaintiffs,

v.

Philip **NOEL**, Governor State of Rhode Island and Providence Plantations, Defendant.

Civ. A. No. 74–91.

United States District Court, D. Rhode Island.

Oct. 31, 1974.

Edward F. St. Onge, North Providence, R. I., for plaintiffs.

W. Slater Allen, Jr., Asst. Atty. Gen., for Rhode Island, Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

Plaintiffs, who seek declaratory and injunctive relief, claim that the defendant, through his agents and in his capacity as Governor of the State of Rhode Island, violated their rights of freedom of speech, freedom of assembly and freedom to petition for a redress of grievances as protected by the First and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred by 28 U.S.C. §§ 1343, 2201, 2202 and 42 U.S.C. § 1983.

## FINDINGS OF FACT [1]

In 1973 the Rhode Island General Assembly enacted and the Governor signed into law the Flat Grant Assistance Program which replaced the former state method of computing welfare payments based on individual need. Plaintiffs and their associates, an *ad hoc* group of welfare recipients and sympathizers both cleric and lay, were convinced that this

---

[1]. These findings are based on testimony given in support of the Temporary Restraining Order issued on April 23, 1974, and evidence presented at the hearing for preliminary injunction which included a number of newspaper articles. The parties agreed these newspaper stories could be accepted as evidence in the case; that the factual recitations contained therein are substantially true. Accordingly I have accepted the factual recitations in said stories as stipulated uncontradicted evidence.

new program would not be flexible to meet dramatically rising costs such as those engendered by the "Energy Crisis" in the fall of 1973. In addition, they opposed Governor Noel's decision to offset a scheduled federal Social Security increase by withdrawing its approximate equivalent from state funds allocated to recipients of both the state and federal benefits. Governor Noel was reported by the press to have characterized his decision to block the so-called "Social Security pass-through" as a "moral dilemma". Responding to this characterization and their own belief that the Flat Grant Program and the "Social Security pass-through" raised moral issues, plaintiffs and their associates decided that they would try to appeal to the Governor, the Assembly, and the public by conducting a prayer service on Ash Wednesday, 1974, and every succeeding Wednesday during Lent, at 1:30 p. m. in the rotunda of the State House, which houses both the General Assembly and the Governor's offices. Each service was to last approximately twenty minutes, thus ending about ten minutes before the start of the Assembly's afternoon session of two o'clock. The plaintiffs chose this particular time and place with the expectation that it would enable them to convey their message at a time when the Governor and legislators would be likely to be in the building and one which also left them with about ten minutes to lobby the legislators before they reconvened. On no occasion did the service continue beyond 2:00 p. m.

In view of the moral issues they believed to be involved, plaintiffs felt that prayer would be a suitable way to convey their message. The format of the prayer service was always the same. The group commenced with a religious song, followed by responsive readings and readings from the Scripture, the Prayer of the Faithful, and concluding with the song. The words of the chorus of the song were printed on a placard for all to sing; the stanzas were sung by those who knew them from memory, usually about ten people. The song generally lasted about five minutes. Plaintiff Menard accompanied the singers on an acoustic guitar. The song that was sung on all but one occasion included the following lines: "Wake up, my people. . . . Wake up to the needs of all who suffer sorrow ! . . . All across the nation . . . hungry people are starving." Descriptions of the intensity of the singing ranged from "prayerful" to "hearty" to "reverberating." Father Ford, an organizer and frequent participant in the sessions, explained that singing and praying in unison were an integral part of the service and the message, serving a two-fold purpose: they established a common bond between the participants and made others aware of their message.

The prayer group first assembled in the State House rotunda on Ash Wednesday, February 27, 1974. The participants numbered approximately one hundred, and they were joined by a number of members of the State Senate and House. Senator Goodwin, who also joined the group on another occasion, held up the placard containing the chorus of the song. On the first occasion only, two guitars accompanied the singing. Approximately 75 met the following Wednesday and conducted essentially the same service. The group was not allowed in the building on March 13, and they held their service on the outside stairs, where the Lt. Governor joined them in prayer. Between 60 and 70 people assembled on March 20 in the rotunda. Up until this point the prayer group had received no complaints whatsoever. They were at all times careful not to block stairways or otherwise interfere with normal traffic. Toward the conclusion of the March 20th service, Joseph Almonte, an executive aide to the Governor, approached Father Ford and informed him that there could be no more singing as it was disrupting State House business.

The State House was off-limits to all without official business on March 27, due to a threat made against the Gover-

nor which was attributed to the Symbionese Liberation Army. When plaintiffs' group returned on April 3, and again on April 10, they were removed at Mr. Almonte's direction for the stated reason that their singing and chanting were disrupting the normal business of the State House. The group did not attempt to return the following Wednesday as it fell during Holy Week. On April 23 plaintiffs filed the instant action, and this Court issued a temporary restraining order enjoining defendant and his agents from interfering with the plaintiffs' Wednesday prayer session on April 24 and all succeeding Wednesdays so long as plaintiffs, *inter alia,* did not obstruct passageways or engage in singing or boisterous conduct, and limited their praying to subdued tones so as not to interfere with the normal operations of State House employees located in nearby offices.[2] In all subsequent assemblies, plaintiffs and their associates have complied with the limitations enumerated in the temporary restraining order. They in fact continued their sessions beyond Lent and have stated that they intend to continue their prayer and lobbying compaign during the upcoming legislative session. Plaintiffs therefore press their claim to be allowed to reincorporate into their program singing and praying in unison, which they consider to be an essential feature of their communication.

It is undisputed that there are no written rules, regulations or guidelines of any sort governing the use of the State House for organized activity. Whatever basis for plaintiffs' expulsion exists in the policy as stated by the Governor in a letter to Ms. C. Lenz, a member of the American Civil Liberties Union:

> "We will not tolerate any kind of demonstration within the building that endangers the lives or safety of others or disrupts the responsibility of state employees to accomplish a day's work in return for a day's pay." [3]

Concededly, only the second reason, disruption of normal business, is asserted by the defendant here. In addition, defendant's counsel further acknowledged that the alleged disruption in the case at bar is limited to the amount of noise produced by plaintiffs' singing and praying in unison.

The record reveals that there is an open-door policy towards the use of the State House rotunda. Any individual or group can assemble to petition for a redress of grievances so long as they comply with the two-prong policy expressed in the Governor's letter. Defendant has at all times represented that plaintiffs' prayer group was not and would not be disturbed so long as it confined the noise level to tolerable limits. The Governor's statement of policy is expressly limited to "demonstrations". Although that word is not self-defining, the record, as set forth below, clearly reveals that the policy and practice applied to

---

2. Specifically the restraining order stated:
1. The demonstrators will not position themselves so that pedestrian traffic in the State House is impeded, or so that any individual is prevented from entering into or exiting from the building or any office located therein.
2. The demonstrators will remain in the building only during those hours in which it is open to the public at large.
3. The plaintiffs will not engage in singing or boisterous conduct.
4. The plaintiffs' praying and/or speaking shall be in such subdued tones so as not to disturb employees working in nearby offices or the Legislators when the General Assembly is in session.

5. The demonstrators will respect the rights of others in the building to be left alone and limit their lobbying contact to consenting individuals.
Defendants state they are "comfortable" with this order, however, they object—more especially to the singing—contending there is no reasonable barometer to gauge what is loud or boisterous. In other words they are not able to determine when there is compliance or violation of the court order. At any rate they will not tolerate disruption. N. 3 *infra.*

3. Plaintiffs' Exhibit 1.

organized activity in the State House distinguishes sharply between government-sponsored and non-sponsored activity. On February 5, 1974, a group of musicians invited by State Senator Taylor played martial music in the Senate chamber upon the passage of a bill requiring the National Anthem to be played at local sports events. The band played "It's a Grand Old Flag", and then the Senators joined in singing "God Bless America". The National Anthem was followed by a round of applause. On March 15, 1974, the General Assembly celebrated St. Patrick's Day from 2 to 6 p. m. with a feast, singing and musical accompaniment, and topical speeches. According to Mr. Almonte, the sounds of the festivities could be heard through closed doors in the Governor's offices. On March 20, when Mr. Almonte first asked plaintiffs to leave, he based his determination that they were too noisy in large part on the fact that sounds of their service could be heard through closed doors in the Governor's offices. The festivities were repeated on March 19, 1974, and with equal zest, when the General Assembly once again used its afternoon session for its annual St. Joseph's Day celebration. This program also featured singing, music, feasting from a lavish buffet of Italian foods, and speeches in the House lounge and chambers. Numerous state employees attended both of these annual events. The public address system used during legislative sessions was utilized on both occasions. Sounds of the celebrations filled the Assembly chambers, corridors, the rotunda, and permeated offices throughout the building. In explaining why no complaints were made on these two occasions, Mr. Almonte stated that the executive branch was not about to interfere with the affairs of the legislature.

It is further undisputed that no individual or agency is charged with the duty of determining when noise levels or other behavior reaches an intolerable level. In the matter at bar, Mr. Almonte undertook to remove plaintiffs based upon his independent determination that they were making too much noise.[4] On March 1, 1974, when a state employees' union rally was held in the rotunda, the executive assistant to the Governor told the group of approximately 150 to leave because they were making too much noise. Immediately preceding this rally at the same site, however, members of the *Peter Pan* theatrical troupe then opening at the Providence Civil Center, at the invitation of the Governor's wife, staged a performance of singing and dancing for one hundred children. The same microphone which had been installed for the troupe's use was subsequently commandeered by the rally organizers for the use of their speakers. The mike was disconnected about half-way through the rally. Nonetheless, some time thereafter, one of the Governor's assistants still determined it necessary to ask the group to disband due to the disruptive noise. No such request was made of the *Peter Pan* troupe, which had used the mike throughout its performance. The time of day these affairs were held roughly corresponds to the time of the plaintiffs' prayer services. It is interesting to note that the State Librarian, who characterized the noise emanating from the labor rally as a "substantial disruption" to the operation of the second floor library, could not even remember if he had been present in the State House on the day the *Peter Pan* troupe entertained.

The State Librarian was not alone in reflecting what can only be termed as selective sensitivity to noise. His chief complaint about the noise produced by plaintiffs' prayer group was that it was loud enough to cause him and his co-workers to leave their posts momentarily

4. Mr. Almonte stated that he asked plaintiffs' group to leave on March 20 "because they were making noise that *would be* disruptive to the employees of the State House." (Emphasis added.) There is no evidence that Mr. Almonte polled any of the State House employees or consulted the Governor prior to asking plaintiffs to leave.

to find out what was happening in the rotunda. On the other hand, he stated that the bell, which rings continuously from 1:45 to 2 p. m. every day for the express purpose of calling legislators to the afternoon session, could hardly be heard in the library at all. Mr. Jankel, a planning aide in the Governor's office, was similarly disturbed by plaintiffs' demonstration and perhaps unwittingly gave the best explanation for these variations in response. He stated that he did not consider his work day to be particularly disrupted by the frequent tour groups that pass through his office or by the St. Patrick's or St. Joseph's Day celebrations, because he was used to the former and had attended the latter. On the other hand, he considered the prayer sessions, as well as other unscheduled demonstrations, to be disruptive, not because the noise prevented him from carrying out his normal activities, but rather because they piqued his curiosity and distracted his attention. Pre-scheduled government affairs, even those which produced equal or greater volumes of noise than plaintiffs' sessions, were not perceived to be disruptive because they could be anticipated and their noise accounted for.

The State House is not a quiet building. During the school year, groups of ten to thirty children are given guided tours ten times per week. A bell rings continuously for fifteen minutes to convene the Assembly for its afternoon session. The rotunda is the scene of both chance meetings and concerted lobbying. The State Library is not the typical preserve of quiet. Normal conversation is permitted at all times. The doors have been closed only twice in the last twelve years. The library has an extensive telephone service in addition to the large numbers of people who come in and out during the day. The rotunda is an area of massive dimensions; the domed ceiling stands approximately 150 feet over the floor. The size and construction of the rotunda cause all sounds, from the clatter of feet to voices raised in song,

to echo. On the basis of this record, which is replete with subjective assessments as to what was "noisy" and "disruptive", this Court cannot determine precisely how much noise the prayer sessions produced. This Court is equally convinced, however, that these sessions, at their loudest, produced no more noise, and in all probability substantially less, than that which emanated from the *Peter Pan*, National Anthem, St. Patrick's or St. Joseph's Day activities.

### The Rotunda as a Public Forum

The defendant does not dispute that, by their prayer sessions, plaintiffs peacefully seek to exercise rights guaranteed to them by the First Amendment of freedom of speech, of assembly, and to petition the government for a redress of grievances. For reasons which follow, I find that the State House rotunda is a public forum appropriate for the exercise of these First Amendment rights.

In Unemployed Workers Union v. Hackett, 332 F.Supp. 1372 (D.R.I.1971), this Court adopted the reasoning of the Second Circuit in Wolin v. Port of New York Authority, 392 F.2d 83 (1968), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968), to find that the waiting room of the Department of Employment Security office was a public forum from which the State could not absolutely bar the exercise of First Amendment activity. The relevant questions which were raised by *Hackett* to determine whether a site is a public forum are as follows:

1) is the proposed situs dedicated to public use;

2) "does the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance."

*Wolin, supra,* at 89.

3) does the proposed forum bear any particular relevance to the protest as either:

a) the actual or symbolic object of the protest; or

b) the place where the intended audience may be found.

*Hackett, supra* at 1379–1380; *Wolin, supra* at 89–90. Bearing these questions in mind, I find there can be no doubt that the State House rotunda is such a forum.[5] Indeed, the defendant, by his open-door policy, virtually concedes as much. The State House building as a whole, and particularly the rotunda, is dedicated to public use. Its doors are open to all during business hours. The public is welcome to observe the Assembly in action and to tour the executive offices. The rotunda itself is the functional equivalent of a public thoroughfare in miniature, connecting executive, administrative and legislative offices and accommodating the steady stream of entrants into the building. Moreover, unlike a courthouse or a jail, there is no more appropriate place for citizens to express their views on issues of social and political significance and to communicate their feelings to their elected representatives than at the State Capitol. Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (hereinafter referred to as *"Cox II"*); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L. Ed.2d 149 (1966). Such peaceful demonstrations at the site of government represent an exercise of First Amendment rights "in their most pristine and classic form." Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963).[6]

### The First Amendment Violation

The defendant has represented to this Court that plaintiffs are more than welcome to continue to assemble in the rotunda to pray silently or in hushed tones, and that defendant has no objection to a continuation of the temporary restraining order entered last April 23. But plaintiffs have determined that they can best convey their message by communal prayer and religious song. That members of the clergy lead and participate in these prayer sessions can only add to the impact of this symbolic aspect of their protest. By such means, plaintiffs have in fact attracted members of their intended audience to join them in prayer and song. Obviously, plaintiffs would be more reasonable if they refrained from praying and singing in unison and more accommodating if they took their protest outside. But this kind of thinking is just what the First Amendment condemns. For this Court to order plaintiffs to tone down their protest to make it more acceptable to the defendant would be tantamount to deciding for plaintiffs how they were going to exercise their First Amendment rights. Judge Coffin's comments in Goguen v. Smith, 471 F.2d 88, 104 (1st

5. This in no way is a departure from my holding in Unemployed Workers Union v. Hackett, *supra*, at 1379:

" 'Streets, sidewalks, parks and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.' Amalgamated Food Employees, etc. v. Logan Valley Plaza, 391 U.S. 308, 315, 88 S.Ct. 1601, 1607, 20 L. Ed.2d 603 (1968). The Department of Employment Security office is a public place to which there cannot be a complete prohibition on the exercise of First Amendment rights. Recognition of State office buildings as being within the scope of areas in which free speech may be exercised is a logical extension of the established doctrine of 'public forums'."

6. In addition "[t]here is an unmistakable symbolic significance in demonstrating close to [the seat of government] . . . which, while not easily quantifiable, is of undoubted importance in the constitutional balance." Women Strike for Peace v. Morton, 153 U.S.App.D.C. 198, 472 F.2d 1273, 1287 (1972) (Wright, J., concurring). *Cf.* Spence v. Washington, 418 U.S. 405, 408–415, 94 S. Ct. 2727, 41 L.Ed.2d 842 (1974).

Cir. 1972), aff'd, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974), are equally applicable here:

"We realize that fine distinctions may be drawn between what constitutes the content of, as opposed to the method used in, symbolic speech. Yet in the nebulous realm of symbolic speech there is truth in the statement that 'the medium is the message' and to suppress the medium is to censor the message." (Citations omitted.)

Judge Coffin's observation highlights the difficulty in applying the "speech pure" versus "speech plus" analysis developed by the Supreme Court to justify regulation of objectionable conduct which is intertwined with protected speech. See, e. g., Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (hereinafter referred to as *"Cox I"*). In a thoughtful and thought-provoking critique of the insufficiencies of this distinction, Judge Wright noted:

"The difficulty with such an approach, however, is that when carefully examined it tends to turn all speech into conduct. All communication imposes some direct costs on a society which chooses to tolerate it. 'If it is oral, it is noise and may interrupt someone else; if it is written, it may be litter.' Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1, 23. * * *

"It is clear, then, that virtually all communication—from the faintest whisper to a large demonstration—is a compound of 'speech' and 'conduct.' The real issue . . . concerns the amount of inimical conduct the state must tolerate in the interest of allowing free communication."

Women Strike for Peace v. Morton, 153 U.S.App.D.C. 198, 472 F.2d 1273, 1282 (1972) (concurring opinion) (hereinafter referred to as "W.S.P."). Thus, the fact that the defendant has not sought to exclude plaintiffs completely does not alter the fact that he is attempting to place conditions upon their exercise of First Amendment rights.

By giving plaintiffs the option of converting their protest into a more acceptable form or leaving the building, the defendant is engaging in a form of prior restraint. A wealth of Supreme Court decisions makes it abundantly clear that First Amendment freedoms command a preferred position and that there is a heavy presumption against the validity of a prior restraint. *See, e. g.,* Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Murdock v. Pennsylvania, 319 U.S. 105, 115, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939). *See also W.S.P., supra* at 1282–1283; *Hackett, supra.* "Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." *Schneider, supra* at 161, 60 S.Ct. at 151. Thus a government regulation which burdens First Amendment rights will not be upheld unless it is in furtherance of a substantial government interest which has no relation to the First Amendment activity involved. United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). *See also* Police Department of Chicago v. Mosley, 408 U.S. 92, 98–99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Grayned, supra* at 115–117, 92 S.Ct. 2294. Furthermore, the regulation must employ the least restrictive means available to achieve the government interest. *E. g., Grayned, supra* at 117, 92 S.Ct. 2294. A regulation which strays from the neutral zone of place, time and manner into the danger zone of censorship based upon content or speaker runs afoul of the Equal Protection Clause, *e. g., Grayned, supra; Mosley, supra,* and belies the authenticity of the governmental interest asserted, e. g., Niemotko v. Maryland, 340 U.S. 268, 272–273, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Jenness v. Forbes, 351 F.Supp. 88, 100 (D.R.I. 1972). *Cf.* Tinker v. Des Moines School

District, 393 U.S. 503, 510, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *See generally* Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct. Rev. 1.

■ The standardless regulatory policy present in the case at bar features all of the constitutional infirmities outlined above, and its brethren have been struck down time and again in a long line of Supreme Court decisions. These cases instruct us that no matter how salutary the government interest sought to be preserved, regulations enacted pursuant thereto must be narrowly and precisely drawn. E. g., Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox I, supra*; Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); *Hackett, supra* at 1377 and cases cited therein. The Supreme Court has long "recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not. This thus sanctions a device for the suppression of the communication of ideas and permits the official to act as a censor." *Cox I, supra* at 557, 85 S.Ct. at 466.

■ Even if this Court were to accept the defendant's proferred rationale for excluding plaintiffs, the policy and practice presently in effect are constitutionally impermissible. No standards at all guide the official in his attempt to prevent disruptive noises or activity. Indeed, no individual or agency is charged with this duty. The current practice is nothing more than an *ad hoc* and subjective determination made by diverse officials that some group or individual protestor is disrupting normal government business. The danger in permitting such a practice is amply demonstrated by the case at bar. The defendant asserts as a substantial government interest the prevention of demonstrations which "disrupt" normal government business. But the mere disruption and momentary distraction experienced by state employees here does not constitute the material disruption or invasion of the rights of others necessary before protected activity can be restricted. *See Tinker, supra* at 513, 89 S.Ct. 733. The preference accorded First Amendment rights loses all meaning if they can be classified "along with the wares and merchandise of hucksters and peddlers and [treated] . . . all alike." *Murdock, supra* at 115, 63 S.Ct. at 876.

■ The record further reveals that similar amounts of "disruptive" or "distracting" noise, when produced by government-sponsored affairs, were tolerated. Regulations embodying a preference and pre-emption for government-sponsored events were rejected out of hand by the D.C. Circuit in *Women Strike for Peace v. Morton, supra,* in a per curiam opinion.[7] Characterizing the St. Patrick's and St. Joseph's Day celebrations as a sort of in-house Christmas party does not change the fact that they occurred during normal working hours, at the same time and place as plaintiffs' sessions, and produced equal or greater volumes of noise.[8] This finding has manifold consequences. First, the fact that such events were allowed to occur unimpeded in the same time, place and

7. The fact that the exclusion in the case at bar was the result of an "amorphous practice," rather than based on a set of written rules as in *W.S.P.,* can only weaken defendant's position. *See Niemotko, supra; W.S. P., supra* at 1286 Cf. *Kunz, supra; Saia, supra.*

8. These celebrations must be distinguished from the bell which rings every afternoon to convene the Assembly. Although the bell also produces a similar amount of noise at approximately the same time and place as plaintiffs' service, it is clearly part and parcel of the normal State House operation and apolitical in character, and thus alone could not be construed to open the forum to plaintiffs' activity.

with equally disruptive sound as plaintiffs' prayer sessions constitutes a waiver of defendant's argument that plaintiffs' exclusion was based solely on the need to prevent disruptive noises, Jenness v. Forbes, *supra* at 100, and indicates that the defendant's real concern was with the content and not the consequences of plaintiffs' message. *Niemotko, supra* at 272, 71 S.Ct. 325; *W.S.P., supra* at 1285. Second, the subjective determination made by Mr. Almonte in the instant case sharply illustrates the dangers inherent in a scheme which gives broad discretion to the official charged with implementing it. The record does not reveal any basis for Mr. Almonte's conclusion that plaintiffs' March 20th session was too noisy other than his own opinion. Equally disturbing, Mr. Almonte testified that it was not until March 20, the third time plaintiffs conducted their session in the rotunda with 60 to 70 people present, that he determined that they were making too much noise. And yet approximately the same number were present for the second session, and about one hundred people and an additional guitarist participated in the first. One is forced to the conclusion that Mr. Almonte's tolerance for plaintiffs' particular brand of noise had diminished, rather than that the volume of the prayer service had increased, thus supporting Justice Douglas' observation that "[a]nnoyance at ideas can be cloaked in annoyance at sound". *Saia, supra* at 562, 68 S.Ct. at 1151.

*The Equal Protection Clause Violation*

█ Third, the Governor's policy both as stated and as applied violates the Equal Protection Clause of the Fourteenth Amendment. The unequal treatment of plaintiffs' sessions as compared to government-sponsored affairs here stands at the crossroads of plaintiffs' First Amendment and Equal Protection claims. *See Mosley, supra* at 95, n. 3, 92 S.Ct. 2286; Bonner-Lyons v. School Committee of City of Boston, 480

F.2d 442, 444 (1st Cir. 1973) and cases cited therein. In his letter to Ms. Lenz, the Governor enumerated a two-prong test to be applied to demonstrations occurring within the State House. If there is any doubt that the word "demonstrations" is limited to activities carried on without prior government approval, the implementation of that policy resolves the question. Mr. Almonte stated that the Governor maintained a hands-off policy vis-à-vis legislative affairs. Outside demonstrators thus were silenced while persons in political power used the same forum, at the same time and with equal vigor. And yet these government-sponsored events were no more a part of the normal functions of the State House than plaintiffs' activity and thus deserved no greater access to the forum than plaintiffs. While some of these events at first glance may seem nonpolitical, such cannot be said of the National Anthem performance, which was clearly intended to promote the passage of pending legislation. In addition, both the St. Joseph's and the St. Patrick's Day celebrations featured political speeches on such topical issues as the current crisis in North Ireland. *Cf.* Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 420 F.2d 597, 602 (1969). Only one conclusion can be drawn from this record: government-sponsored affairs have greater access to this forum than outside groups wishing to exercise First Amendment rights. The case law could not be clearer that such favoritism constitutes a denial of equal protection unless the state substantiates a compelling state interest for the discrimination:

"Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views . . . Once a forum is opened up to assembly or speaking by some groups, government may not

prohibit others from assembling or speaking on the basis of what they intend to say."

*Mosley, supra* at 96, 92 S.Ct. at 2290. *See also Grayned, supra; Niemotko, supra; Bonner-Lyons, supra* at 444; People Acting Through Community Effort v. Doorley, 468 F.2d 1143 (1st Cir. 1972); *W.S.P., supra* at 1290 (Wright, J., concurring). *Cf.* Jenness v. Forbes, *supra.* The government's only interest asserted herein, that of noise control, is undermined by its very tolerance of those government-sponsored events which give rise to plaintiffs' equal protection claim in the first place.

The Court is aware of the potential hardships which may confront the defendant when faced with the two-fold responsibility of complying with the order of this Court and maintaining order and "business as usual" in the State House. Yet embodied in a vigorous enforcement of the First Amendment is the realization that some degree of harmony and orderliness in society will have to be sacrificed in order to preserve the freedoms guaranteed by it, lest the converse occur. *Cf. Wolin, supra,* at 91. This is not to say that activities such as described in this opinion cannot be *wholly* prohibited in the Governor's office or on the floor of the legislature during normal business hours upon a determination that such activities in either of those locations would disrupt essential governmental operations.[9] Nothing in this opinion and order would prevent the promulgation of written regulations regarding use of the State House provided they are narrowly and precisely drawn and evenhandedly applied. Upon the happening of same, this Court would feel constrained to vacate its order in the within action. However, unless and until such rules are enacted, it is hereby ordered that plaintiffs and their prayer group are not to be denied access to the State House rotunda by the defendant, his officers, agents, or employees, so long as plaintiffs conduct their prayer service in substantially the same manner as has been represented to the Court.[10]. Obviously, plaintiffs have no right to monopolize the rotunda every Wednesday between 1:30 and 2 p. m. *ad infinitum* to convey their particular message. Scheduling conflicts may arise, and plaintiffs' prayer sessions can no more pre-empt others who wish to use the forum than could government-sponsored affairs uniformly pre-empt plaintiffs. *Cf.* Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). *See also* Kalven, The Concept of the Public Forum, *supra.* at 25–27. The permanent injunction hereby entered is limited by these two qualifications on plaintiffs' use of the rotunda to conduct their prayer sessions.

9. "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order . . . . The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible *to abuses of discriminatory application,* cannot be disregarded by the attempted exercise of some civil rights which, in other circumstances, would be entitled to protection . . . a group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." *(Cox I, supra* at 554, 85 S.Ct. at 464 (Emphasis added.)

10. *I. e.,* There will be no obstruction of stairways or passageways, no mechanical amplification of the singing or praying, and the service will conclude before the start of the Assembly's afternoon session.