The TOWARD A GAYER BICENTEN-
NIAL COMMITTEE et al.

v.

The RHODE ISLAND BICENTENNIAL
FOUNDATION et al.

Civ. A. No. 76–93.

United States District Court,
D. Rhode Island.

June 9, 1976.

See also, D.C., 417 F.Supp. 642.

Stephen Fortunato, Jr., Pawtucket, R. I., for plaintiffs.

Peter J. McGinn, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The plaintiff Toward a Gayer Bicentennial Committee (the Committee) is an unincorporated umbrella organization of individuals and representatives of other groups[1] that has as its principal purpose the dissemination to the public at large of information regarding the legal, social, and political circumstances and aspirations of persons with a homosexual or bisexual preference, through the medium of events and activities related to the celebration of the bicentennial of the founding of this country. The defendant Rhode Island Bicentennial Commission (the Commission) is a creation of the state legislature whose purpose "shall be to plan the celebration of the 200th anniversary of the state's independence . . . including, but not limited to . . . planning and coordinating the entire statewide program to celebrate the state's anniversary. . . ." Act of March 18, 1969.

On July 11, 1975, the plaintiff Committee submitted a proposal to the defendant Commission describing plans for a "Congress of People With Gay Concerns" and a "Gay Pride Parade" to be held on June 26, 1976, during national Gay Pride Week. The plaintiffs sought to have these activities included in the Commission's calendar of bicentennial events and requested use of the Old State House as a site for their proposed Congress. On August 21, 1975, the Commission denied the Committee's request, and after further communications between the two entities, the Committee and several of its members instituted this action against the Commission and its mem-

1. The Gay Help Line and the Metropolitan Community Church have each designated a representative to work with the Gayer Bicentennial Committee. Other organizations whose members have participated or allegedly intend to participate in the activities of the Gayer Bicentennial Committee include Gay Community Services, Gay Women of Providence, Rhode Island College Gay Alliance, and Alcoholics Together of Providence.

bers and against the related Rhode Island Bicentennial Foundation and its members.[2]

The plaintiffs allege that the defendants acted capriciously and arbitrarily in denying their request for recognition and use of the Old State House, and that the withholding of such recognition abridges the plaintiffs' freedoms of speech, assembly, and association and denies them equal protection of the law, in violation of the First and Fourteenth Amendments to the United States Constitution. They seek an injunction prohibiting the defendants from withholding official recognition of their proposal and from withholding access to any of the public forums or activities which is a privilege of such official recognition. Jurisdiction is based on 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

## I. FINDINGS OF FACT

### A.

The Rhode Island Bicentennial Commission consists of 25 members, and the Chairman is Dr. Patrick T. Conley, a professor at Providence College. The Commission invites proposals for bicentennial projects and celebrations from Rhode Island official agencies and municipalities, civic or other groups, and the general public. To help coordinate the diverse programming, the Commission has established eight standing committees in such areas as ethnic heritage, historical preservation, religious and social awareness, women, and publications. Proposals which, in the judgment of the Commission, will contribute to the objectives for which it is chartered, are approved for either official endorsement or sponsorship.

Endorsement constitutes official Commission recognition of bicentennial projects implemented by groups or individuals outside the Commission. Endorsed projects are permitted to use the Commission's official "ri 76" logo, may have dates approved by the Commission and listed in the Commission's calendar of bicentennial events, may receive limited planning and staff assistance from the Commission, and may have access to the Old State House, a historical landmark now used by the Commission as its headquarters, for receptions, lectures, historical displays, etc. In some cases, endorsement is a preliminary step to sponsorship. Sponsored projects are those, whether developed internally or by groups or individuals outside the Commission, which are presented by the Commission itself. Sponsorship implies substantial financial underwriting by the Commission or the related Rhode Island Bicentennial Foundation.

At the evidentiary hearing held on June 1, 1976, the defendants introduced a document entitled "The Bicentennial Projects Policy" prepared by the Commission which describes in general terms the types of projects the Commission will endorse or sponsor and outlines the procedures to be followed by those submitting proposals.[3] The Commission prefers to receive proposals relating to one or more of the following three themes:

> *Heritage* : which relates to the founding and development of the nation and states.
> *Festival* : which relates to celebrating our 200th birthday.
> *Horizons* : which relates to means to improve the nation and state."

Defendants' Exhibit A at 3.

The section entitled "Procedures" begins, "The Commission will receive ideas or concepts in any form, preferably by letter." *Id.* at 5. A model format is also presented, however, suggesting the specifics which should be included in the proposal.[4] A pro-

---

**2.** The Rhode Island Bicentennial Foundation is the financial arm of the Bicentennial Commission. The plaintiffs seek no funding from the Commission, however, so the Foundation's presence as a defendant in this action is superfluous.

**3.** Defendants' Exhibit A. The defendants also introduced as Exhibit B a second document,

entitled "Projects Policy," which appears to be an earlier and less complete version of Exhibit A. Exhibit A repeats and amplifies most of what is contained in Exhibit B, and the two documents are in no way inconsistent.

**4.** "FORMAT:

Proposals for Commission review should be submitted in the following format. It is real-

posal received by the Commission is reviewed by the Special Projects Manager, who, after consulting with appropriate staff members, Commission members, and committees, will include the proposal on a Commission meeting agenda along with comments as to its appropriateness, feasibility, timeliness, conflict with other projects and events, the ability of the Commission to promote it, its acceptability, and his recommendations. The Commission will then, either as a whole or in committee, review the proposal, hold hearings if needed, and decide to endorse, sponsor, or reject the proposal. The originator of the proposal is notified of the decision by letter, and if the proposal is rejected, reasons for the decision will be stated. *Id.* at 5–6.

Two additional publications of the Commission were also introduced into evidence, the current brochure of the Commission, Plaintiffs' Exhibit 8, and the 1975 Annual Report of the Commission, Plaintiffs' Exhibit 9. Both documents describe in general terms the purpose and activities of the Commission, and both include lists of projects receiving sponsorship or endorsement from the Commission. Over fifty sponsored projects are described, ranging from "Tall Ships '76" to a hockey game between high school teams from Sweden and Rhode Island. Over ninety endorsed projects are listed, covering such diverse topics as Christmas in Newport, the Bristol Fourth of July Celebration, the Rhode Island College Ethnic Heritage Program, the Valley Forge Monument, and International Women's Year Equality Day.

The Old State House, located at 150 Benefit Street in Providence, is an important Rhode Island historical landmark, for it is the building in which Rhode Island renounced its allegiance to England on May 4, 1776. Once used as the State Capitol, the building has more recently been used as a courthouse, and currently houses the offices of the Rhode Island Bicentennial Commission and Foundation. Restoration of the Old State House is one of the sponsored projects of the Commission, and the building will eventually be used as office space for certain state agencies, with portions of the building to be used to display artifacts of Rhode Island history. According to the testimony of Dr. Conley, the Commission currently uses most of the building as work space for Commission and Foundation activity, but portions of the building are made available to organizations for use in bicentennial projects or celebrations endorsed by the Commission. Of particular significance is a large room with a capacity of about 150 persons. One endorsed project for which the Old State House facilities were used was the Diocesan Bicentennial Reception of the Roman Catholic Diocese of Providence, held on April 19, 1975.

#### B.

In their initial correspondence with the Commission, dated July 11, 1975, the Toward a Gayer Bicentennial Committee did not request endorsement by name, but there could be no doubt at the Commission that endorsement was what was being sought. The Committee described briefly its plans for June 26, 1976: the Congress of People With Gay Concerns to be held in the morning; the Gay Pride Parade in the afternoon; and a Prayer Vigil at midnight. The Committee then requested use of the Old State House for its Congress and ex-

ized that all proposals will not fit a rigid format and appropriate variations will be accepted.
A. Title
B. Brief description
C. Objective (of the project)
D. Relevance (to the Rhode Island Bicentennial celebration)
E. Location
F. Date(s)
G. Proposed sponsor
H. Liaison official (name, title, address, phone) and other principals
I. Detailed description of project
J. Time frame
K. Sponsor's resources (including experience)
L. Estimated cost
M. Outside support needed
N. Anticipated support available
O. Assistance requested from the Rhode Island Bicentennial Commission"
Defendants' Exhibit A at 6.

pressed a desire to have its activities listed in the Commission's schedule of bicentennial events and, in general, "to be a part of the total bicentennial celebration." Plaintiffs' Exhibit 1.

The Committee was notified in a letter dated August 21, 1975, from Commission Chairman Conley that the Commission had voted on August 19 to deny endorsement to the proposal. Two reasons for the decision were offered: that there was not a sufficient connection between the Committee's proposal and the bicentennial; and that "certain practices advocated by the Gay Movement are in direct contravention of [Rhode Island law] . . . [and as] a state agency it is inadvisable to endorse groups which advocate practices that are of questionable legality." Plaintiffs' Exhibit 2.

In a letter dated August 25, 1975, the Committee indicated some uncertainty in its interpretation of Dr. Conley's August 21 letter and renewed its request to use the Old State House, providing further details about its proposed Congress of People With Gay Concerns and offering to provide additional information "fairly soon." Plaintiffs' Exhibit 3. Dr. Conley on September 3 again denied the Committee's request, pointing out that "The Old State House, which is headquarters of ri 76, is only made available to endorsed projects of the Rhode Island Bicentennial Commission." Plaintiffs' Exhibit 4.

The correspondence continued on November 12, 1975, when counsel for the Committee wrote to Dr. Conley and once again asked that the Commission allow the Committee to use the Old State House, this time explicitly asking for endorsement, and all its attendant rights and privileges, as well.[5] In addition, the letter stated:

"[T]he Toward a Gayer Bicentennial Committee does not advocate any illegal activity, though I am sure you are aware that the First and Fourteenth Amendments to the United States Constitution preclude punishment for the mere advocacy of illegal behavior and actions." Plaintiffs' Exhibit 5.

Dr. Conley for a final time denied the Committee's requests, and in a November 19, 1975 letter to plaintiffs' counsel wrote:

"While the Commission recognizes your client's constitutional right to advocate certain behavior, we believe it should be equally apparent that the Commission is not compelled to sponsor, adopt or participate in every project presented to it. We continue to believe that there does not exist a sufficient connection between your client's activities and the Bicentennial to warrant endorsement." Plaintiffs' Exhibit 7.

## II. LEGAL ISSUES PRESENTED

The plaintiffs contend that the defendants' refusal to endorse their proposal and to permit them to use the Old State House constitutes an infringement of their First Amendment rights. In their view, the Rhode Island Bicentennial Commission has created in the Old State House a public forum much like a street or a bus terminal, and is consequently prohibited from restricting access to that forum on the basis of the content of the proposed speech. *See, e. g., Police Dept. of City of Chicago, v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968). In addition, they argue that the Commission has granted endorsement to other proposals which have had the purpose of calling attention to the problems of other special groups in society, such as blacks and women, and that therefore the Commission's withholding of an endorsement from their proposal constitutes a denial of equal protection.

The defendants respond by arguing that they acted reasonably and within the scope of their authority in denying the plaintiffs' request for endorsement. They maintain

---

5. The letter also requested, for the first time, that the Commission "create a standing committee to be known as the Gay Committee, much in the same fashion that there is now a Religious and Social Awareness Committee, an Ethnic Heritage Committee, etc." Plaintiffs' Exhibit 5. This request is apparently not being pressed by the plaintiffs in this action.

that the Old State House is not a public forum but rather a facility available solely for uses related to bicentennial connected projects endorsed by the Commission. The Commission, they continue, has wide latitude in the exercise of its discretion in determining what proposals are sufficiently in keeping with bicentennial themes to warrant endorsement.

■ The defendants also raise a procedural objection to the plaintiffs' claim, and that must be addressed before proceeding to the substantive arguments of the parties. They contend that the Commission was justified in rejecting the Gayer Bicentennial Committee's proposal because it failed to satisfy the format requirements prescribed in the Commission's "Bicentennial Projects Policy." There is absolutely no evidence in the record, however, to indicate that incorrect format was the reason for the Commission's rejection of the proposal. Dr. Conley's letter of August 21, 1975, in accordance with Commission policy, stated the reasons for which the Commission denied endorsement, and there was no mention therein of a failure on the Committee's part to comply with particular application procedures. Indeed, the first mention of such an argument that this Court is aware of was in the defendants' answer in this action filed on April 6, 1976, eight months after the Committee's proposal was rejected.

Moreover, the procedures outlined by the Commission are by their own admission flexible: "It is realized that all proposals will not fit a rigid format and appropriate variations will be accepted." Defendants' Exhibit A at 6. No doubt the Committee's proposal could have been more complete, but the Committee clearly indicated its willingness to provide further information. Rather than request such information or conduct a hearing, as its procedures permit, the Commission rejected the Committee's proposal outright. For the Committee to have concluded, under these circumstances, that submission of a more detailed proposal would be futile would not have been unreasonable.

The key to the plaintiffs' case is whether or not the Commission's refusal to endorse the plaintiffs' proposal and consequent denial of their request to use the Old State House constitutes a denial of access to a type of public forum. If it does, the close scrutiny and rigid standards of First Amendment analysis must be applied to an examination of the Commission's criteria for restricting access to the forum.

■ The defendants, of course, argue that endorsement of projects by the Bicentennial Commission is not, like a public forum, a right to which the plaintiffs or anyone else is automatically entitled. Rather it is a valuable governmental benefit analogous to nontenured state employment or a subsidy of the arts which the government may deny on any number of grounds in the reasonable exercise of its discretion.[6] *See, e. g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Advocates for Arts v. Thomson,* 532 F.2d 792 (1st Cir. 1976).[7]

---

**6.** Even if the defendants prevailed on this point, they could not completely escape the application of First Amendment analysis. For even where the government may grant or withhold a benefit with great discretion for a variety of reasons, "[i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). *See also Advocates for Arts v. Thomson,* 532 F.2d 792 (1st Cir. 1976). In the present case, the Commission admitted that one reason for its rejection of the plaintiffs' proposal was that certain practices advocated by the "Gay Movement" "are of questionable legality." Plaintiffs' Exhibit 2. This is

clearly an impermissible basis for the defendants' actions. Government is barred from interfering with all speech excepting that which is calculated to produce "imminent lawless action," *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), *see also Healy v. James,* 408 U.S. 169, 187, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), and there is no evidence in the record to indicate that the Toward a Gayer Bicentennial Committee's activities proposed for June 26th would be so calculated.

**7.** The distribution of limited resources in *Advocates for Arts* resembles the funding of bicentennial projects through Commission sponsorship much more closely than it does Commis-

## 638

### III. A LIMITED PUBLIC FORUM

The clearest examples of public forums, and the first to be explicitly recognized as such, are streets and parks. *See, e. g., Police Dept. of the City of Chicago v. Mosley, supra* (streets); *Women Strike for Peace v. Morton,* 153 U.S.App.D.C. 198, 472 F.2d 1273 (1972) (park). In the widely quoted language of Justice Roberts in *Hague v. Committee For Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939):

> "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."

More recently, the public thoroughfare analogy has been used to extend the public forum concept to bus terminals, *Wolin v. Port of New York Authority, supra,* and, by this Court, to the State Capitol, *Reilly v. Noel,* 384 F.Supp. 741, 747 (D.R.I.1974).[8]

█ Once a situs is designated a public forum, the power of government to restrict expression therein is extremely circumscribed. The paramount principle is that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. Thus, "[o]nce a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend

to say." *Mosley, supra,* 408 U.S. at 96, 92 S.Ct. at 2290. Nevertheless, reasonable regulations controlling "time, place, and manner" of expression in a public forum are permissible. For example, conflicting demands on the same place may compel the state to make choices among potential users and uses. *Id.* at 98, 92 S.Ct. 2286. However, the regulations must be in furtherance of a substantial governmental interest that has no relation to the First Amendment activity involved. *Id.* As this Court wrote in *Reilly*:

> "A regulation which strays from the neutral zone of place, time and manner into the danger zone of censorship based upon content or speaker runs afoul of the Equal Protection Clause . . . and belies the authenticity of the governmental interest asserted . . . ."

384 F.Supp. at 748 (citations omitted). Finally, the regulations must be narrowly and precisely tailored to their legitimate objectives, to avoid the dangers inherent in a scheme which gives broad discretion to the official charged with implementing it. *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951); *Reilly, supra,* at 749.

These principles have been applied in numerous areas besides those closely analogous to public thoroughfares. Last term, for example, the Supreme Court held them applicable in a case involving access to a municipal auditorium. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). In this Circuit, the Court of Appeals has ruled that

sion endorsement. There is no indication that there are any constraints on the number of endorsements the Commission may grant, and *Advocates for Arts* may therefore be distinguished on that ground. A situation may arise, of course, where the state may have a legitimate interest in limiting the distribution or availability of a particular governmental benefit even where there are sufficient resources to distribute the benefit on a larger scale. The Bicentennial Commission's endorsement program does not present such a case, however. For reasons discussed in the text, *infra,* I conclude that the Old State House is indeed a public forum, although perhaps of a hybrid

type, and the right to use that forum can be burdened with only the most limited restrictions. Since the Commission, as its own initiative, has chosen to make endorsement a prerequisite to access to the Old State House, it follows that the restrictions on endorsements must be equally limited.

8. In *Reilly,* this Court wrote: "The rotunda itself is the functional equivalent of a public thoroughfare in miniature, connecting executive, administrative and legislative offices and accommodating the steady stream of entrants into the building." 384 F.Supp. at 747.

forums made available to some recognized student organizations must be made available to all such organizations on an equal basis, *Gay Students Org. of University of New Hampshire v. Bonner,* 509 F.2d 652 (1st Cir. 1974), and that public school information distribution systems cannot be used to disseminate antibussing literature unless probussing groups are also provided access, *Bonner-Lyons v. School Committee of City of Boston,* 480 F.2d 442 (1st Cir. 1973). In the latter case the Court wrote:

> "[O]nce a forum is opened for the expression of views, *regardless of how unusual the forum,* under the dual mandate of the first amendment and the equal protection clause neither the government nor any private censor may pick and choose between those views which may or may not be expressed."

480 F.2d at 444 (emphasis added).

Finally, this Court in *Unemployed Workers Union v. Hackett,* 332 F.Supp. 1372 (D.R.I. 1971), held that an association of unemployed workers could not be prohibited from speaking with and distributing literature to members of the public waiting in line at the state unemployment office:

> "Recognition of State office buildings as being within the scope of areas in which free speech may be exercised is a logical extension of the established doctrine of 'public forums.'"

332 F.Supp. at 1379.

 It is the conclusion of this Court that, in light of these precedents, the Rhode Island Bicentennial Commission has created in the Old State House a public forum for activities related to bicentennial themes. Such a forum can be characterized as a "limited public forum." Because the plaintiffs' proposal appears to be related to the bicentennial, as discussed, *infra,* the Court need not reach the very interesting question whether the Old State House must also be considered a public forum for all types of expression, whether or not it is related to the bicentennial.[9]

---

**9.** It could be argued that, while the Old State House is a public forum, it is not as wide open a one as a street, a park, or a bus station. Certainly public access to such a building does not have roots in "time immemorial," *cf. Hague, supra,* and the building cannot be considered a mere enclosed public thoroughfare through which large numbers of people pass each day, the way a bus station or even the rotunda of a state capitol building can. *See Wolin, supra; Reilly, supra.* Furthermore, stricter time, place, and manner limitations can be imposed where access to a forum must be reconciled with the rights of other users, such as the rights of government employees to be free of disruptions that interfere with their work. *See e. g. Reilly, supra; Unemployed Workers Union v. Hackett, supra.* This consideration is particularly important here, where according to the testimony of Dr. Conley, those very portions of the Old State House that are made available for endorsed projects are usually in use as general work space for the Commission and must be cleared out for every special function. Thus, every use of the Old State House as a forum disrupts the daily activities of the Commission to some extent.

The forum created at the Old State House, it could be argued, should be considered only "a limited public forum." The State, operating through the Rhode Island Bicentennial Commission, has chosen to make certain facilities available to the public for activities related to the State's celebration of the bicentennial. Because these activities can include the expression of ideas and promotion of associational goals, the guarantees of the First Amendment must be respected. Therefore, to the extent the forum created is a public forum, the principles reviewed above defining the permissible extent of government regulation of access to such forum must be strictly observed. On the other hand, the Commission seeks to provide this public forum for only certain types of activities, those related to the bicentennial. Hence, the notion of a *limited* public forum. At first blush, the suggestion that the Commission might be able to limit expression at the Old State House to topics related to the bicentennial seems totally incompatible with the public forum principles expounded by the Supreme Court in *Mosley, supra*:

> "[Government] may not select which issues are worth discussing or debating in public facilities. . . . Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone."

408 U.S. at 96, 92 S.Ct. at 2290.

*Mosley,* however, concerned a question of picketing on a public street, traditionally the most open of all public forums. The public forum doctrine developed, it must be remembered, in response to increasing efforts by government to cut back, restrict, and close off access to forums which were historically, traditionally, and, perhaps, inherently, wide open for all types of expression. It would be difficult to

The defendants' argument that the Old State House is not a public forum because it may not be used by anyone for bicentennial projects but only by those whose projects have received Commission endorsement must be rejected. There can be no doubt that the Old State House provides an excellent site for bicentennial projects, in light of both its own historic importance and its official role as the center for the planning and coordination of Rhode Island's bicentennial observances, and that the Bicentennial Commission has in fact made the Old State House available for such purposes for endorsed projects. Where official endorsement or recognition is a prerequisite to the exercise of First Amendment rights, it cannot be considered a mere "stamp of approval." *Healy v. James*, 408 U.S. 169, 182, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). In the words of Judge J. Skelly Wright:

> argue that the public has a similar historical, traditional, and inherent right of access to the offices of a state agency for purposes totally unrelated to that agency's state function. Thus, the Bicentennial Commission's decision to make the Old State House available for bicentennial activities, far from restricting access to what would otherwise be a wide open forum, is creating access to what might otherwise not be a forum at all.
>
> This concept would be entirely consistent with *Unemployed Workers Union v. Hackett, supra*, where this Court ruled that First Amendment rights extended to the state unemployment office. In *Hackett*, the communication was taking place in a waiting area to which the public was freely admitted, and was related to the problems of the unemployed. A significant factor in that decision was the propriety of the unemployment office for the plaintiffs' activities: "Nowhere else may persons who receive unemployment compensation be found for purposes of organizational activity." 332 F.Supp. at 1380.
>
> The limited public forum concept would also be consistent with the First Circuit's decision in *Bonner-Lyons v. School Committee of City of Boston, supra*. In that case, the defendant School Committee had sanctioned the use of the internal distribution system of the City's schools for the dissemination of notices opposing bussing to achieve school integration. The Court concluded that the School Committee had thus created in the distribution system "a forum for discussion of *at least those issues which were treated in this notice*." 480 F.2d at 443 (emphasis added). The Court therefore

"If [First Amendment rights] could be exercised only when government is willing to offer its co-sponsorship to the speaker, a system of free expression would be indistinguishable from a system of prior restraint."

*Women Strike For Peace v. Morton, supra*, 472 F.2d at 1280.

The Commission has, on its own initiative, chosen to make endorsement a prerequisite to access to the Old State House. In so doing, it has, therefore, made its criteria for endorsement subject to the same scrutiny, under the same standards, as any other restraint on free speech.[10]

Assuming that the Commission can restrict access to the Old State House, as a limited public forum, to projects related to bicentennial themes, it is still required to make such judgments on the basis of precise and clear standards even-handedly applied. Unbridled discretion by public offi-

> ruled that the defendants be enjoined from so using the distribution system unless others having differing views on such subjects were also given access to the system. The Court was not presented with the question of whether persons wishing to use the distribution system for issues totally unrelated to bussing or the schools should be given access, but the limited public forum approach could arguably be applied in such a case.
>
> The most troublesome aspect of the limited public forum approach, of course, would be the necessity to define the "limits" of the forum, i. e., the general purposes for which it is made available, with enough precision that it could be applied even-handedly, without being used as a shield to cover censorship of expression that should fall within the scope of even the limited public forum.

10. Thus, this Court need not determine what standard of review would apply to a challenge to the Commission's denial of endorsement if access to the Old State House were not an issue. Conceivably, endorsement itself could be considered a type of public forum, since among the benefits received by endorsed projects are publicity and inclusion on the Commission's calendar of Bicentennial events. Even if endorsement in such a case were not considered access to a public forum, it could not be denied for reasons burdening the exercise of First Amendment rights, such as a dislike of the political views of the applicants. *See* note 6, *supra*. *Cf. Advocates of Arts, supra*.

cials over the use of a public forum is anathema to a free society, not to be condoned. In the pantheon of constitutional rights, the First Amendment is indeed the "First" treasured among all. As the Supreme Court recently explained, "The reasoning has been, simply, that the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions, Ltd. v. Conrad, supra,* 420 U.S. at 553, 95 S.Ct. at 1244.

 The defendants' present system of endorsement fails to meet this standard. The only written criterion for endorsement placed in evidence before this Court is the "preference" that proposals relate to one or more of the three bicentennial themes: Heritage, Festival, and Horizons. Defendants' Exhibit A at 3. The category into which the plaintiffs' proposal appears most closely to fit is Horizons.[11] That theme, according to a Commission publication, "relates to means to improve the nation and state" and encompasses projects "encouraging activities leading to a better life, enhanced appreciation of opportunities for individual and collective freedom, and national cohesion and purpose." Defendants' Exhibit A at 3, 4. Another Commission publication describes one of the functions of the Commission's Religious and Social Awareness Committee to be review of "projects for the bicentennial which deal with the social changes which have developed during the past two hundred years *as well as those which might affect social change in the years ahead.*" Plaintiffs' Exhibit 9 (emphasis added). In describing the Women's Committee, it says "Special emphasis will also be given to determining the future of women in Rhode Island." *Id.*

Based on this material, it would seem to this Court that the plaintiffs' proposal, which they describe as hopefully "attract[ing] both Heterosexuals and Homosexuals who are concerned with the role of Gay People in our Society," Plaintiffs' Exhibit 3, meets the Commission's standards for endorsement as a Horizons project. According to Commission Chairman Conley, on the other hand, it does not. When asked to clarify the standards used in making that decision, however, Dr. Conley was unable to comply. He testified that there were no written standards beyond those in evidence for determining whether a proposal has a sufficient bicentennial nexus, and that standards are "established when the proposal or project is discussed by the Commission." Of the Horizons theme, he said, "The third area, which admittedly is a very nebulous area, is the Horizons area, and it is in this area that the Commission exercises its greatest amount of discretion in deciding which Horizons oriented programs it would be advisable and appropriate to endorse." When asked by plaintiffs' counsel whether the Bicentennial Commission had taken it upon itself to determine what the appropriate horizons are for Rhode Island and the nation, Dr. Conley replied: No, the Commission reviews programs to decide if they are "tasteful, appropriate, and suitable" ways to celebrate the bicentennial.

Clearly, the explanation given by Dr. Conley for the Commission's refusal to endorse the plaintiffs' proposal fails to satisfy the standards of precision and clarity established by the Supreme Court. It must be rejected. The defendants shall have one week in which to either endorse the plaintiffs' proposal and grant them all the rights and privileges attendant to endorsement, including access to the Old State House; or promulgate in writing, in clear and precise terms capable of even-handed application,

**11.** Reverend Joseph H. Gilbert, Chairperson of the Toward a Gayer Bicentennial Committee, testified that one or more of the speakers at the proposed Congress of People with Gay Concerns would discuss the historical presence in society of homosexuals, who "have always been in the midst of the people," and perhaps discuss their contributions to the development

of this nation over the last 200 years. Although this would appear to place the plaintiffs' proposal at least partly in the Heritage classification, the defendants pointed out that this was the first time they were informed what subjects the Congress would cover, and thus they could not have evaluated it as a Heritage proposal.

**642**

the standards to be used in evaluating the plaintiffs' request for endorsement.[12] If the defendants choose to issue new standards, they must clarify, but not curtail, the application of the present standards. That is, for example, they may not decide to eliminate the Horizons category altogether.[13] Moreover, if the defendants issue new standards, the plaintiffs shall be permitted to file a new project proposal for endorsement in light of these standards, and the defendants shall then have five days to either grant the proposal or provide a clear and precise written explanation of its decision.[14]

■ It must be noted here that the plaintiffs' proposals involve only the expression and exchange of ideas, and Commission endorsement affirms only their right to engage in activities protected under the First Amendment. No ideas are so far beyond the pale of the wider community's values that they are also beyond the boundaries of the First Amendment. *See Gay Students Organization of the University of New Hampshire v. Bonner, supra,* 509 F.2d at 658. As Justice Black so simply expressed it:

> I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish."
> *Communist Party v. SACB,* 367 U.S. 1, 137, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961) (dissenting), *quoted in Healy v. James, supra,* 408 U.S. at 188, 92 S.Ct. at 2349.

I cannot help but note the irony of the Bicentennial Commission expressing reluctance to provide a forum for the plaintiffs' exercise of their First Amendment rights because they might advocate conduct which is illegal. Does the Bicentennial Commission need reminding that, from the perspective of British loyalists, the Bicentennial celebrates one of history's greatest illegal events?

**12.** It is the opinion of this Court that standards for defining a "bicentennial nexus" are indeed capable of clear and precise statement. This case is not like *Advocates of the Arts v. Thomson, supra,* where the Court refused to impose such a requirement on the standards for granting or denying public funding of the arts, viewing it as "unwise to require an objective measure of artistic merit as a matter of constitutional law." 532 F.2d at 797.

**13.** If the Commission wishes to substantively change its standards *prospectively,* of course, it is free to do so at any time. However, it may not substantively change its standards as ap-

plied to these plaintiffs, in light of the substantial possibility raised in this record that the plaintiffs have been treated in discriminatory fashion by the defendants.

**14.** I would not ordinarily impose such rigid time constraints upon the defendants. However, the plaintiffs have scheduled their proposed activities for June 26, less than three weeks away. That date is important to them because it falls during Gay Pride Week, and the Commission should bear any difficulties in correcting the constitutional defects of its own endorsement program.