**Dean R. WILSON and Vera Logue by
Mary Logue, her next
friend, Plaintiffs,**

v.

**Rose CHANCELLOR et al., Defendants.**

Civ. No. 76–92.

United States District Court,
D. Oregon.

Sept. 2, 1976.

Don H. Marmaduke, Larry K. Amburgey, Portland, Or., for plaintiffs and Cooperating Attorneys for American Civil Liberties Union of Oregon.

Bruce P. Bischof, Lake Oswego, Or., for defendants.

## OPINION

BURNS, District Judge.

Plaintiffs Wilson and Logue seek declaratory and injunctive relief from a school board order banning "all political speakers" from Molalla Union High School (MHS). They contend that the order violates the First Amendment and the equal protection clause of the Fourteenth Amendment, and is unconstitutionally vague and overbroad. Jurisdiction is based on 28 U.S.C. § 1343(3, 4).

Wilson teaches the political science class at MHS in which Logue was a student. This dispute arose when Wilson invited a Communist, Anton Kchmareck, to speak to that class. Wilson already and without objection had presented a Democrat, a Republican, and a member of the John Birch Society. The Communist was to be the last of this quadrumvirate through which Wil-son hoped to present, in the words of the adherent, each of four points of view.

Wilson followed customary procedure and reported this invitation to the principal. The principal approved. Defendant school board discussed the invitation at its November 1975 meeting and also approved. This procedure was neither unprecedented nor customary.

The board's approval inspired mixed reviews. Two severe critics called a community meeting on December 4 where they circulated a petition asking the board to reverse the decision; approximately 800 persons eventually signed it. Several townsfolk, in letters to the local newspaper, mentioned the possibility of voting down all school budgets and voting out the members of the board.

Faced with this petition and many outraged residents, the board on December 11 reversed its decision and issued orally an order banning "all political speakers" from the high school.

The case came on for hearing on plaintiffs' motion for preliminary injunction. The parties submitted written statements and offered testimony and exhibits. The parties then agreed that the court could regard the hearing as a full trial on the merits because all necessary evidence was in.

## I. FIRST AMENDMENT CLAIMS:

A. *Plaintiff Logue: Right to Hear*

Miss Logue contends the order violates her First Amendment right to hear the speech of others.

The right to hear customarily is invoked by prisoners denied access to periodicals, e. g., *Johnson v. Anderson*, 370 F.Supp. 1373, 1391 (D.Del.1974), members of a potential audience for a speaker prohibited from speaking, e. g., *Brooks v. Auburn University*, 296 F.Supp. 188 (M.D.Ala.1969), aff'd 412 F.2d 1171 (5th Cir. 1969), or persons asserting either the public's "right to know," e. g., *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) or the emerging right of

privacy, *e. g., Stanley v. Georgia*, 394 U.S. 557, 560–64, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

■ Of these cases, only the potential audience cases are applicable here: *Brooks, supra, Vail v. Board of Education of Portsmouth School Dist.*, 354 F.Supp. 592 (D.N.H. 1973), and *Smith v. University of Tennessee*, 300 F.Supp. 777 (E.D.Tenn.1969). These cases[1] and my recognition that the First Amendment exists to protect a broad range of interests persuade me that Logue suffered an infringement of her First Amendment rights. Whether the infringement was justifiable is discussed *infra* (C (2) Reasonableness of the Order).

### B. *Plaintiff Wilson: Right of Academic Freedom*[2]

Few courts have considered whether and to what extent the First Amendment protects academic freedom. Honored in Germanic tradition and prominent in academic debates, the theory rarely surfaces in legal opinions. Moreover, even its most enthusiastic advocates usually distinguish between the freedom to be accorded university professors and that to be accorded elementary and secondary school teachers. It seems to be assumed that the former engage in the search for knowledge and therefore should have far greater freedom than the latter, who merely disseminate knowledge.[3]

The Supreme Court of the United States has discussed academic freedom in "eloquent and isolated statements."[4] *See, e. g., Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Barenblatt v. United States*, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). Lower courts have spoken more frequently, but none has clear-

ly defined the theory's legal contours. Nor will I. This case can be decided by using purely conventional freedom of expression analysis.

### C. *Plaintiff Wilson: Freedom of Expression*

■ A teacher's teaching is expression to which the First Amendment applies. The right to freedom of expression is not absolute; it may be restricted, and restrictions on a teacher's expression should be judged in light of the "special characteristics of the school environment." *Tinker v. Des Moines Independent School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

■ In imposing restrictions and making other decisions, school boards should be allowed great discretion. No court should intervene merely because a board's decision seems unwise. But if school boards, in exercising their discretion, act so as to interfere impermissibly with the constitutional rights of students or teachers, or both, courts must and will intervene if their jurisdiction is properly invoked.

These considerations in mind, I address two pivotal questions: First, is a teaching method or vehicle a form of expression protected by the First Amendment? Second, if so, is the restriction at issue here reasonable?

### (1) *Teaching methods as forms of expression*

Three cases have treated teaching methods as protected forms of expression: *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969), *Parducci v. Rutland*, 316 F.Supp. 352 (M.D. Ala.1970), and *Sterzing v. Fort Bend Independent School Dist.*, 376 F.Supp. 657 (S.D. Tex.1972).

1. Compare those cases which discuss the public's right *not* to hear, *e. g., Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949).

2. For a general discussion, *see* Miller, *Teacher's Freedom of Expression in the Classroom: A Search for Standards*, 8 Ga.L.Rev. 837 (1974);

*Developments—Academic Freedom*, 81 Harv.L. Rev. 1045 (1968).

3. Developments, *supra* note 2, at 1053; T. Emerson, The System of Freedom of Expression, ch. XVI, p. 597 (1969).

4. T. Emerson, *supra* note 3, at 616.

The teacher in *Keefe* assigned his class an Atlantic Monthly article containing a word which "admittedly highly offensive, is a vulgar term for an incestuous son."[5]

A school committee summoned Keefe to defend his conduct. When he was asked to agree not to use the word again, he declined. He subsequently was suspended, and sought a temporary injunction against the committee's dismissal hearing.

The district court denied an interlocutory injunction pending a decision on the merits. The court of appeals reversed, holding that plaintiff had demonstrated he probably would succeed on his lack of notice and academic freedom claims.

In *Parducci,* the teacher assigned her eleventh grade English class a Kurt Vonnegut, Jr. short story, "Welcome to the Monkey House." Several parents complained. School officials admonished the teacher not to use the story in any of her classes, and threatened to dismiss her if she refused. The teacher resigned. In her suit for injunctive relief she contended that the school's action violated her First Amendment rights.

The court recognized such a right, but concluded that it must be balanced against competing societal interests, most prominently the "state's vital interest in protecting its young people from any form of extreme propagandism in the classroom." 316 F.Supp. at 355. The court also recognized that *Tinker,* supra, requires the state to demonstrate that

> "[T]he forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" 393 U.S. at 509, 89 S.Ct. at 738.

The court then held that because the assignment was appropriate and presented no threat of disruption, the teacher's dismissal

for assigning the short story violated her First Amendment rights.

In *Sterzing* a teacher disclosed to his civics class his lack of opposition to interracial marriage. After several parents complained, school officials urged Sterzing to confine his teaching to the assigned textbook. He ignored this request and several times departed from the text during the ensuing five months. Shortly after Sterzing administered an allegedly propagandistic test on race relations, the school board voted to discharge him for insubordination.

The district court ordered that Sterzing be reinstated. It held that a teacher has a substantive right to choose teaching methods which serve a demonstrated educational purpose. "A responsible teacher," wrote the court, "must have freedom to use the tools of his profession as he sees fit." 376 F.Supp. at 662.

■ Although these three cases involved actual or threatened dismissal, a teacher's freedom of expression can be impermissibly restricted even if dismissal is not threatened; prohibitions against certain teaching practices impliedly carry a threat of sanction and thereby restrict a teacher's freedom of expression.

■ These cases also recognize the validity of a popular maxim, "the medium is the message." The expresser's medium can affect the persuasiveness of his message, the duration of its influence, and the size and type of audience which it reaches. The act of teaching is a form of expression, and the methods used in teaching are media. Wilson's use of political speakers was his medium for teaching; similarly, the short story was Parducci's medium, the pamphlets were Sterzing's media, and the article containing the controversial words was Keefe's medium. The various school boards which restricted the media employed by Wilson here, and by Keefe, Parducci, and

---

5. Writing an opinion involving a discussion of this case and that word presents a dilemma. The use of a euphemism tends to obscure the significance of the decision. The use of the word itself tends to insult the unwary reader of judicial opinions. Perhaps such readers are a

hardier breed than I suppose, but I have chosen the former alternative. Those who are made of sterner stuff may consult footnote 7 of the *Keefe* case, 418 F.2d at 361; *see, also, Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973).

Sterzing in the cases cited, suppressed expression which the First Amendment protects.

But school boards may restrict teachers' expression if the restrictions are reasonable in light of the special circumstances of the school environment. Thus, question two: was this order reasonable?

### (2) *Reasonableness of the Order*

 I conclude that the order was not reasonable and therefore violated the First Amendment.

The order barred political speakers absolutely, yet no disruptions had occurred in Wilson's classes, or at other school gatherings where political subjects were discussed. Further, none were expected in the future.

The defendants have not shown that outside speakers impair high school education. If they did, the board still would lack justification for banning only outside *political* speakers. Moreover, the evidence demonstrated that the use of outside speakers is widely recommended, widely practiced, and professionally accepted.

 The boards cannot justify the ban by contending that political subjects are inappropriate in a high school curriculum. Political subjects frequently are discussed at Molalla High School and other schools throughout the country, as required by law.[6] Nor does the board have a valid interest in suppressing, as it did, political expression occurring in the course of recognized extracurricular activities.

 The board cannot contend it was acting within its discretionary power to exclude incompetent speakers. It acted under pressure from those who feared, rather than doubted, the speaker's competence by banning all speakers without regard to competence.

 The board's only apparent reason for issuing the order which suppressed protected speech was to placate angry residents and taxpayers. The First Amendment forbids this; neither fear of voter reaction nor personal disagreement with views to be expressed justifies a suppression of free expression, at least in the absence of any reasonable fear of material and substantial interference with the educational process.

### D. *Prior Restraint*

 The order, by granting school officials discretion to bar political speakers before those persons speak, creates a system of prior restraint.[7]

 Prior restraints are not unconstitutional per se, but their invalidity is heavily presumed. *Bantam Books v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). They are valid only if they include criteria to be followed by school authorities in determining whether to allow or forbid the expression, and procedural safeguards in the form of an expeditious review procedure. *Baughman v. Freienmuth,* 478 F.2d 1345 (4th Cir. 1973); *Quarterman v. Byrd,* 453 F.2d 54, 58–59 (4th Cir. 1971).[8]

The Molalla board order was completely bare; it failed to include either criteria by which to define "political speakers" or procedural safeguards in any form.

The order therefore constitutes an invalid prior restraint. Although our language contains many words and phrases which require no further definition, the phrase "political speakers" is not among them.

---

**6.** Political subjects invariably will arise during the course of study required in Oregon schools by Oregon law. ORS 336.057 requires public and private schools to give instruction in the constitution of the United States for a minimum of five years. ORS 336.067 requires "special emphasis" on instruction in obedience to law, respect for the flag, and the federal and state constitutions, and "other lessons which tend to promote and develop an upright and desirable citizenry."

**7.** For a pertinent discussion, *see Note, Prior Restraints in Public High Schools,* 82 Yale L.J. 1325 (1973).

**8.** *See also Eisner v. Stamford Board of Education,* 440 F.2d 803 (2d Cir. 1971). *But see Fujishima v. Board of Education,* 460 F.2d 1355 (7th Cir. 1972) (prior restraint invalid, although adequate procedural safeguards provided).

*See also Brooks v. Auburn University,* 412 F.2d 1171 (5th Cir. 1969) (University president's prohibition against speech by antiwar activist invalid prior restraint; no criteria for determining speaker eligibility); *Ginsberg v. City of Miami,* 307 F.Supp. 675 (S.D.Fla.1969) (municipal stadium manager's interruption of allegedly obscene poetry reading invalid prior restraint); *Reilly v. Noel,* 384 F.Supp. 741 (D.R.I.1974) (governor's directive forbidding state building's use in a manner involving "singing or boisterous conduct," or involving praying or singing above a "subdued tone" invalid prior restraint).

E. *Vagueness* [9] *and Overbreadth*

 The void-for-vagueness doctrine usually is invoked to invalidate criminal statutes so vague that they deter people from exercising their constitutional rights for fear they will be punished. Harsh administrative sanctions also can produce this "chilling effect," however, *see Soglin v. Kauffman,* 418 F.2d 163 (7th Cir. 1969), but courts rarely invalidate non-criminal statutes for that reason. Writing in 1960, a noted commentator could find only one case in which a vagueness challenge to a non-criminal statute succeeded: *A. B. Small Co. v. American Sugar Ref. Co.,* 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925). *Note, Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L.Rev. 67, 69–70 n. 16 (1960).

 In determining whether a statute or regulation will survive a vagueness attack, courts should look to the penalties which may be imposed. In Professor Amsterdam's words, "the seriousness of what is at stake" is an "extremely significant variable." *Note, supra,* at 70 n. 16.

In *Soglin, supra,* much was at stake; the regulation authorized expulsion from the University, which carried with it loss of academic progress, tuition, and the stigmatizing notation "expelled" on the college student's record.

 Less is at stake here. The Molalla order usually will be enforced by an order requiring the speaker to cease, a reprimand, or perhaps temporary suspension. This would not cause financial loss, loss of academic progress, or stigma of the magnitude involved in *Soglin.* These sanctions are not sufficiently severe to require the board to promulgate a less ambiguous regulation.[10]

 I also hesitate to declare the order either void-for-vagueness or overly broad because I believe plaintiffs lack standing to raise these claims in a declaratory judgment proceeding. This is true even though the order reaches political speech—the very category of speech which the First Amendment was designed to protect.

Article III standing normally is not an obstacle in overbreadth or vagueness cases because a plaintiff's interest in not being punished is sufficiently adverse to constitute a case or controversy. *See* A. Bickel, *The Least Dangerous Branch,* 149–50 (1962). Plaintiffs do not seek relief from punishment, however; they seek declaratory relief, and the standing hurdle is formidable.

None of the major prior restraint cases dealing with the standing issue involved declaratory relief. *See, e. g., Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). Plaintiffs in all three cases had been charged with or convicted of statutory violations.

Plaintiffs claim the regulation will be applied in the future to forbid their constitutionally protected exercise of free speech. Unless and until the regulation actually is applied in that fashion, however, a justiciable case or controversy would seem not to

---

9. The void-for-vagueness doctrine is treated brilliantly by the author of *Note, The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L.Rev. 67 (1960).

10. Plaintiffs do not contend that the order fails to comply with ORS 339.240, which requires that district school boards "attempt to give the widest possible distribution of reasonable written rules regarding pupil conduct, discipline, and rights and procedures pertaining thereto."

exist. *See United Public Workers v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) (". . . but the facts of [plaintiff's] personal interest in their civil rights, of the general threat of interference with those rights . . . if specified things are done by appellants, does not make a justiciable case or controversy.").

I recognize that garden-variety declaratory judgment actions rarely constitute classic Article III "cases or controversies" and that this circuit has entertained declaratory judgments about the legal consequences of future conduct, *e. g., Crowell v. Baker Oil Tools,* 143 F.2d 1003 (9th Cir. 1944). This case raises important constitutional questions, however, and the Supreme Court has held that questions on the scope and constitutionality of legislation, particularly on important questions of law, must not be decided in advance of its immediate adverse effect in the context of a concrete case. *Longshoremen's Union v. Boyd,* 347 U.S. 222, 224, 74 S.Ct. 447, 98 L.Ed. 650 (1954).

Viewed alone, plaintiffs' overbreadth and vagueness claims involve an abstract, hypothetical case rather than a concrete one. Hence, I do not reach these claims.[11]

## II. EQUAL PROTECTION CLAIMS:

### A. The Ban Generally and Prospectively

The challenged order discriminates against political speakers by banning only them from the high school. It also discriminates against teachers of politically-oriented subjects by prohibiting only them from using outside speakers in the classroom.[12]

Legislation invariably classifies and discriminates; whenever it grants benefits to some classes it denies them to others. These classifications are inherent in the legislative act, and are unconstitutional only under prescribed circumstances.

Classifications which restrain conduct protected by the First Amendment are unconstitutional unless they suitably further an appropriate governmental interest. *Chicago Police Department v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *see also Young v. American Mini Theatres,* —— U.S. ——, 96 S.Ct. 2440, 49

---

11. In *Opinion of Justices,* 362 Mass. 891, 284 N.E.2d 919 (1972) the Supreme Judicial Court of Massachusetts found impermissibly vague a bill which regulated political advertising without defining it. The resulting vagueness, according to the court, "would produce an unnecessarily chilling effect on the publication of any political advertising." 284 N.E.2d at 922.

The school board probably gave too little thought as to whom, other than Kchmareck, the political speakers ban would apply. The word "political" itself connotes different things to different people, not excluding judges and editors of dictionaries. It has been defined as pertaining to the policy or administration of government, *People v. Morgan,* 90 Ill. 558, 563, and as pertaining to the policy as distinguished from the administration of government, Webster's Third New International Dictionary. In one context, the word was construed to imply only the orderly conduct of government rather than revolution, *Wilson v. Loew's Inc.,* 142 Cal. App.2d 183, 298 P.2d 152, 157 (1956), a definition defendants in this case certainly did not intend.

Without more, the word political is too vague and its meaning too elusive to tolerate in regulations aimed at protected conduct. I suspect the board members would have learned this if they had attempted to enforce the regulation across the board.

For example, would they have had to forbid a class discussion of possible environmental harm from a nuclear power plant? What if a nuclear regulation measure was on the fall ballot? Would spokesmen of either point of view be "political" speakers?

Would a guest historian discussing in Molalla's American History class the Indian treaties of the 1850's, and the fishing clauses they contained, be a "political" speaker in the year 1976?

What if a science teacher invited a forester to discuss clear cutting? Is this nonpolitical in light of *Monongahela?*

Are "politicians" always political speakers, regardless of their topic? Would Governor Bob Straub and former Governor Tom McCall ever be nonpolitical speakers, regardless of the subject they discussed?

Fortunately I need not answer these questions because the parties agreed that the disinvited speaker was, indeed, a political speaker.

12. It seems clear that reasonable restrictions on the time, place, and manner for outside speakers would withstand an equal protection-First Amendment challenge. *See Police Department v. Mosley, supra; Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

L.Ed.2d 310 (1976).[13] Appropriate governmental interests include the desire to promote effective education by preventing material disruptions of classroom work, substantial disorders, or invasions of the rights of others, *Tinker, supra,* or by averting a clear and present danger, *Whitney v. California,* 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1925).

Because I already have concluded that the order did not further any appropriate governmental interests, and therefore violated the First Amendment, I must also conclude that it violated the equal protection clause. The order exists to silence absolutely the expression of an unpopular political view, solely out of fear that some will listen. This the government, acting through the school board, cannot do.

### B. *The Ban as Applied*

The board discriminated in a third way. It allowed Wilson to invite a Republican, a Democrat, and a member of the John Birch Society to speak to his class, but it forbade him from inviting a Communist.

The effect was discriminatory. Persons with palatable views could speak; those with less readily digestible views could not.

An order prohibiting Wilson from inviting a Republican to class after a Democrat had spoken there clearly would be discriminatory. That Wilson invited a Communist rather than a champion of the current political orthodoxy has no constitutional significance.

Wilson has standing to raise the speaker's claim, by analogy to the line of cases in which a plaintiff, by complying with a directive, would have denied the constitutional rights of a third party. *See, e. g., Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (party sued for breach of racially restrictive covenant may assert the equal protection claims of black persons). Standing should be found whenever a plaintiff is faced with a choice of either asserting a constitutional claim or complying with and abetting a discriminatory policy. *See Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (plaintiff doctor allowed to assert privacy rights of patients); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (married plaintiff allowed to assert equal protection claim of single persons to whom the distribution of contraceptive devices was a felony).

### III. CONCLUSION:

I do not imply that members of a community now may sue to compel schools to open their doors to particular outside speakers. Such compulsion would restrict a teacher's freedom rather than protect it, contrary to the important policies that I have outlined.

Nor do I suggest that Federal courts stand ready to regulate the regimen and to control the curricula of our public schools. A teacher is not required to have outside speakers contribute to class. I hold only that this regulation, as it applied in this particular set of facts, does not withstand constitutional scrutiny.

And I do not malign the defendant board members. Their position is sensitive, at once both a challenge and an opportunity. They serve a community in which many persons equate Communism with violence, deception, and imperialism. Yet violence, deception, and imperialism have occurred under many flags and in the name of many creeds. School boards could eliminate much of the high schools' curricula by restricting them to theories, philosophies, and practices of resolutely pacifistic, honest, nonexpansionist societies.

It seems these same residents fear that young Molallans will become young Marxists and Maoists, virtually overnight. Because Oregon law, ORS 336.057–067, requires the schools to specially emphasize our form of government, respect for the flag, and obedience to our laws, this fear seems

---

13. *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) is yet another First Amendment-equal protection case.

**1368**

ill-founded. Moreover, today's high school students are surprisingly sophisticated, intelligent, and discerning. They are far from easy prey for even the most forcefully expressed, cogent, and persuasive words.

Finally, I am firmly convinced that a course designed to teach students that a free and democratic society is superior to those in which freedoms are sharply curtailed will fail entirely if it fails to teach one important lesson: that the power of the state is never so great that it can silence a man or woman simply because there are those who disagree. Perhaps that carries with it a second lesson: that those who enjoy the blessings of a free society must occasionally bear the burden of listening to others with whom they disagree, even to the point of outrage.

Plaintiffs should prepare a proposed form of order, and, if necessary, a hearing will be scheduled to discuss the terms of the order. Plaintiffs should submit any statement they wish as to the subject of attorney's fees.

The foregoing constitutes findings of fact and conclusions of law pursuant to F.R. Civ.P. 52(a).