**Rex FISHER, Appellant,**

v.

**FAIRBANKS NORTH STAR BOROUGH SCHOOL DISTRICT, Appellee.**

**No. 7446.**

Supreme Court of Alaska.

Aug. 9, 1985.
Rehearing Denied Sept. 30, 1985.

Michelle V. Minor, Anchorage, and Rita Allee, Fairbanks, for appellant.

Michael B. Markham, Asst. Borough Atty., Fairbanks, for appellee.

Before BURKE, C.J., and MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

Rex Fisher, a tenured teacher at Lathrop High School in Fairbanks, was not rehired for the 1978–79 school year. Three reasons were given by the School Board for his non-retention: (1) violation of sick leave regulations by claiming he was sick on two days when he was actually on a trip to San Francisco; (2) violation of the District's policy against using books in class that had not been approved; and (3) violation of the School District's requirement that lesson plans be submitted after having been requested in writing numerous times to do so. Fisher sought and received a trial *de novo* before the superior court, which con-

cluded that his non-retention was justified on each of the stated grounds.[1]

■ Under AS 14.20.175(b)(3) a tenured teacher may be non-retained for "substantial noncompliance with the ... regulations or bylaws of the department, the bylaws of the district, or the written rules of the superintendent...." The superior court found that Fisher was in substantial noncompliance with the regulations and bylaws of the district in each respect charged. These findings will not be disturbed on appeal unless they are clearly erroneous. Civil Rule 52(a). The evidence amply supports each of the court's findings and they therefore must stand.

Fisher's challenge to the superior court's finding concerning his unauthorized use of the book *The Front Runner* raises a number of additional issues. Fisher used *The Front Runner* in the homosexual rights unit of his American Minorities class. Fisher acknowledges that he did not have approval for use of the book, but argues that there was no applicable school district regulation or by-law requiring advance approval.

A school district rule, denominated Policy 6160.1a, provided as follows:

For all courses in which textbooks are to be used, the textbooks shall meet in style, organization, and content the basic requirements of the course for which they are intended. The term "textbook" shall refer to books which are used as the basic source of information in any class, and may include literary works, collections of literary works and literary selections, collections of musical selections designed for instructional purposes, and laboratory manuals.

The Superintendent of Schools is responsible for presenting a list of recommended textbooks to the Board of Education for formal adoption.

1. The trial *de novo* was held pursuant to AS 14.20.205, which provides:

If a school board reaches a decision unfavorable to a teacher, the teacher is entitled to a de

novo trial in the superior court. However, a teacher who has not attained tenure rights is not entitled to judicial review according to this section.

Supplementary printed materials are used to enrich the curriculum in the classroom. The term "supplementary printed materials" shall refer to those books not intended for use as textbooks which cover part or all of the course affected, drill and exercise books, pamphlets, newspapers, periodicals, etc.

The Superintendent of Schools is responsible for approving selection of supplementary printed materials for enrichment purposes, subject to budget limitations.

Fisher argues that *The Front Runner* was "supplementary printed materials" rather than a "text book" under the terms of the rule. Although both types of materials require prior approval, there is evidence that the rule had not been enforced with respect to supplementary materials, suggesting that if the book fell within the supplementary materials category, the school district may have waived its right to enforce the rule against Fisher.

Fisher, however, was given clear prior written notice that the rule would be enforced with respect to any materials that he proposed to use in teaching the homosexual rights unit. The school principal, William Brannian, wrote a memorandum to Fisher dated October 14, 1977, stating in relevant part:

At our meeting of October 6, 1977, you mentioned that you planned or had already ordered classroom sets of books on "gay civil rights" or about "gays." May I point out, that according to School Board Policy 6160.1a, the Superintendent of Schools is responsible for presenting a list of recommended textbooks to the Board of Education for formal adoption. I would also like to point out that according to this same policy the Superintendent of Schools is responsible for approving selections of supplementary printed material for enrichment purposes, subject to budget limitations.

Since the books that you have ordered have not been approved, I am instructing you not to use them in your class until they have been authorized.

And, on January 13, 1978, Brannian wrote another memo to Fisher:

I have been advised that you are using a classroom set of books, in your American Minorities class, that have not been approved as per School Board Policy # 6160.1a.

I am instructing you not to use these books until they are approved and to submit a copy of the book to me for approval.

Failure to do so as requested would be in violation of School Board Policy # 6160.-1a and my memorandum to you dated October 14, 1977.

I would consider your failure to do so insubordination and report same to the superintendent.

On January 16th, Fisher responded in a memo to Brannian stating in part: "What is the name of the book you are talking about? Certainly the book has a title and an author. How am I to respond unless you communicate with me more clearly?" On January 18th, Brannian entered Fisher's class and observed the class using *The Front Runner*. Despite the posture taken by Fisher in his memo of January 16th, it is clear that no approval of *The Front Runner* had been conveyed to Fisher.

 Where the requirement of a rule or condition has been waived, the requirement may be reinstated by giving notice to the other party.[2] The notice reflected by Brannian's memos of October 14th and January 13th suffices to render enforceable the rule requiring prior approval of supplementary materials.

Fisher also contends that the prior approval rule violates the principle of freedom of speech under the First Amendment

---

**2.** *See* Restatement (Second) of Contracts § 84, at 220 (1979); 5 Williston on Contracts § 689, at 309 (3d ed. 1961); *Stephens v. State,* 501 P.2d 759, 761 (Alaska 1972); *Fehl-Haber v. Nordhagen,* 59 Wash.2d 7, 365 P.2d 607 (1961); *Cotton-* *wood Plaza Associates v. Nordale,* 132 Ariz. 228, 644 P.2d 1314, 1319 (Ariz.App.1982); *Bell v. Yale Dev. Co.,* 102 Ill.App.3d 108, 57 Ill.Dec. 777, 429 N.E.2d 894 (1981).

to the United States Constitution.[3] He argues that *The Front Runner* was appropriate to the subject taught as it illustrates how society discriminates against homosexuals, and that he therefore had the right to use the book. We have no occasion to doubt the truth of his assertion that the book was appropriate, nor did the trial court. The question, however, is not whether the use of a particular book in a course is appropriate but whether the teacher or the administrator is to decide appropriateness in cases of conflict.

State law resolves this question against the teacher. *Kenai Peninsula Borough School District v. Kenai Peninsula Education Association,* 572 P.2d 416, 422–23 (Alaska 1977). In *Kenai Peninsula,* we held that school boards have the sole authority to determine matters of educational policy and may not negotiate with teacher's unions concerning them. The selection of instructional materials was held to be a non-bargainable element of educational policy, committed to the discretion of school boards. This holding did not, however, consider the constitutional question raised by Fisher.

There are cases suggesting that in the event of conflict, secondary school teachers rather than their supervisors or school boards have a right protected by the First Amendment to determine what instructional materials to use. *Keefe v. Geanakos,* 418 F.2d 359, 362 (1st Cir.1969); *Parducci v. Rutland,* 316 F.Supp. 352 (M.D.Ala. 1970); *Dean v. Timpson Independent School District,* 486 F.Supp. 302 (E.D.Tex. 1979). There are also cases, however, vesting control of the selection of educational materials in the school administration and school board, rather than the teacher. *Pratt v. Independent School District,* 670

F.2d 771, 775 (8th Cir.1982); *Zykan v. Warsaw Community School Corp.,* 631 F.2d 1300, 1305 (7th Cir.1980); *Cary v. Board of Education,* 598 F.2d 535 (10th Cir.1979); *Palmer v. Board of Education,* 603 F.2d 1271, 1274 (7th Cir.1979), *cert. denied,* 444 U.S. 1206, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980); *Brubaker v. Board of Education,* 502 F.2d 973, 984–85 (7th Cir.1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975); *Parker v. Board of Education,* 237 F.Supp. 222, 229 (D.Md. 1965). The issue has received much scholarly attention.[4]

Dicta in *Board of Education, Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), suggests that the constitutional issue should be decided in favor of the school boards. The principal question in *Pico* was whether a school board had violated the First Amendment by removing certain books from school libraries. The district court had granted summary judgment in favor of the board, but the court of appeals reversed, finding an issue of fact as to the board's motivation for removing the books. The Supreme Court upheld the court of appeals' decision, finding that the First Amendment imposes limits on the discretion of school boards to remove library books. The Court held that issues of fact existed as to whether the board's motive in ordering the books removed was to deny students access to ideas with which the board disagreed, and thus was constitutionally impermissible or, whether the books were removed because they were "pervasively vulgar" or educationally unsuitable, permissible motives under the constitution. 457 U.S. at 871, 102 S.Ct. at 2810, 73 L.Ed.2d at 449–50. In so holding, the Court distinguished library

**3.** Fisher does not mention, nor does he place any reliance on the free speech provision of the Alaska Constitution, art. I, sec. 5. Accordingly, we do not address his claim under that provision.

**4.** *See, e.g.,* Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045 (1968); Van Alystyne, The Constitutional Rights of Teachers and Professors, 1970 Duke L.J. 841 (1970); Gold-

stein, The Asserted Constitutional Right of Public School Teachers to Determine What They Teach, 124 U.Pa.L.R. 1293 (1976); Hunter, Curriculum, Pedagogy, and the Constitutional Rights of Teachers in Secondary Schools, 25 Wm & Mary L.Rev. 1 (1983); Diamond, The First Amendment and Public Schools: The Case Against Judicial Intervention, 59 Tex.L.Rev. 477 (1981).

control from curriculum control, suggesting that school boards have great authority as to the latter:

Petitioners [the board] might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values. But we think that petitioners' reliance upon that duty is misplaced where, as here, they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway.

457 U.S. at 869, 102 S.Ct. at 2809, 73 L.Ed.2d at 448.

The Court also stated:

We are ... in full agreement with petitioners that local school boards must be permitted to "establish and apply their curriculum in such a way as to transmit community values," and that "there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political."

457 U.S. at 864, 102 S.Ct. at 2806, 73 L.Ed.2d at 445.

▮ The Court's emphasis on the school board's right to control curriculum in order to inculcate community values seems distinctly inconsistent with those decisions which suggest that teachers have the final say with respect to instructional materials. We therefore decline to follow those cases and instead regard those cases which place control over instructional material in school boards as more accurately reflective of federal constitutional law.

▮ We add that while those authorities which we accept hold that the school board's authority over the classroom materials is very broad, it is not entirely unfettered by the constitution. A board may not design a curriculum to favor a particular religion. *Cary v. Board of Education*, 598 F.2d at 544; *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Similarly, any effort by a board to force racial bias or partisan political preference into the classroom would be constitutionally suspect, *Board of Education v. Pico*, 457 U.S. at 870–71, 102 S.Ct. at 2810, 73 L.Ed.2d at 449, as would an attempt to exclude discussions of "an entire system of respected human thought." *Epperson v. Arkansas*, 393 U.S. at 116, 89 S.Ct. at 276, 21 L.Ed.2d at 241 (Stewart, J. concurring); *Cary v. Board of Education*, 598 F.2d at 543. Further, in cases of doubt as to what may and what may not be distributed or taught to students, advance notice may be required before punishment can be imposed. *Epperson v. Arkansas*, 393 U.S. at 112, 89 S.Ct. at 274, 21 L.Ed.2d at 239 (Black, J. concurring); *Cary v. Board of Education*, 598 F.2d at 541.

This case, however, involves none of the above limitations.[5] To sustain Fisher's position we would have to hold that the advance approval rule is unconstitutional on its face. Such a holding would go far to eliminate a school board's right to control curriculum, a result clearly not required by the first amendment.

Fisher raises various other contentions which we find to be without merit.[6]

The judgment is AFFIRMED.

**5.** The worst that could be said about the school district's refusal to approve *The Front Runner* was that it was motivated by a desire not to accord what was felt to be undue emphasis to a controversial subject. Fisher's supervisor, to whom the book had been presented, testified that he felt the topic should be covered with current materials, periodicals, and newspapers and only a short time should be spent covering it. Fisher's supervisor, and another teacher, also formally reviewed the book and concluded that it was unsuitable because of its explicit descriptions of homosexual acts, objectionable language, and glorification of homosexuality. However, these formal reviews were only conducted after the principal had discovered on January 18th that Fisher was using the book and thus cannot be regarded as the reasons in fact that the book was not approved.

**6.** They are that Fisher proved that he was the victim of discrimination because of his teacher's union activities, and that he was not accorded full discovery. The first point is a factual one whose resolution against Fisher is not clearly erroneous. On the second point we find no abuse of discretion.

COMPTON, J., dissents.

RABINOWITZ, C.J., not participating.

COMPTON, Justice, dissenting in part.

Although I agree with the court's disposition of matters alluded to in n. 6, I cannot agree with its treatment of the principal issue in the case, i.e., whether Fisher's First Amendment rights were violated by the manner in which his use of *The Front Runner* was treated.[1]

Analysis of this issue is made no easier by the fact that neither Brannian, nor anyone else as far as this record discloses, knew just what materials were meant to be encompassed by Policy 6160.1a, how that policy was to be implemented, or by whom. His October memorandum to Fisher merely paraphrases the policy, and admonishes Fisher not to use the book until it has been approved. His January memorandum only refers to Policy 6160.1a, a requirement that the book be approved, and that Fisher is to "submit a copy of the book to me [Brannian] for approval." Since the text of Policy 6160.1a does not require a teacher to do anything, the correspondence leaves one wondering whether it is the school board, the superintendent or Brannian, the principal, from whom approval must be obtained. Further, Brannian cannot unequivocally characterize the material as a textbook or as supplementary printed material, or either, if such a distinction is material to this case. Brannian's unfamiliarity with the

terrain may be best understood in light of the total absence in the record of any evidence that anyone was ever required to submit supplementary printed material to anyone for their approval.

James R. Ranney, social studies department head at Lathrop High School and Fisher's supervisor, knew that *The Front Runner* had not been approved, since it had not been submitted to a newly created district wide social studies department curriculum committee for approval. However, Fisher had submitted the book to Ranney for purchase by the school and Ranney had leafed through it. Brannian had declined to purchase it for budgetary reasons. There is no evidence that any books Fisher requested to be purchased were submitted by Ranney to anyone for substantive approval. Furthermore, the policy makes no reference to any departmental curriculum committee.

If the issue before the court was simply whether school boards possess broad authority over curriculum in a secondary education setting, I would have little hesitancy in joining the court's opinion. Certainly as far as the federal constitution is concerned, *Pico*'s[2] plurality, concurring and dissenting opinions almost conclusively so indicate. This indication is dicta, but strong enough to leave little room for doubt as to the outcome.

However, broad authority over curriculum does not mean that the First Amendment places no restrictions on school board

---

**1.** I expressly disassociate myself from the court's venture into fact finding presented in n. 5. What the "worst" is, I suppose, lies like beauty in the eyes of the beholder. One could find from this record that Fisher enjoyed a good reputation with administrators until he became active in union affairs. He was then suspended, but voluntarily reinstated during a superior court trial *de novo,* which the school district lost anyway. Its appeal was dismissed for lack of progress. He was later again suspended for activities arising out of union affairs, but again reinstated.

When Fisher decided to include "gay rights" in his class, Brannian ordered Fisher not to teach it, but recanted on advice of counsel. Right about the time Brannian notified Fisher

he was recommending nonretention, Fisher contacted the Fire Marshall about apparently impermissibly chained doors. This upset Brannian, who complained to custodians that he would "get the son-of-a-bitch yet." He did.

The "worst" may thus be that Brannian and other administrators, displeased with Fisher and frightened by the spectre of notoriety arising from teaching too much about "gay rights," used Policy 6160.1a to score a double victory. However, what is "worst" ought not concern us. What the constitution requires should.

**2.** *Board of Education, Island Trees Union Free School District No. 26 v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982).

conduct, a point acknowledged by the court. While the court identifies some areas of activity by teachers and students protected by the First Amendment, it neglects to identify those predicates that must exist before a school board may properly override otherwise protected conduct. It is here that the analysis fails.

In this case there is a prior restraint on Fisher's constitutionally protected right. While prior restraints are not unconstitutional *per se*, their invalidity is heavily presumed. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584, 593 (1963); *Wilson v. Chancellor*, 418 F.Supp. 1358, 1364 (D.Ore.1976). The school board has established no criteria for determining what texts it will or will not approve, nor any criteria to guide superintendents (or principals or curriculum committees) in the exercise of their responsibility regarding supplementary materials. *Wilson* at 1364. Indeed, the policy is so vague that Brannian cannot even tell us whether *The Front Runner* is a text (and hence required to be approved by the school board) or supplementary printed material (and hence required to be approved by the superintendent).

The policy, such as it is, suffers from yet another defect, that being its failure to provide any review mechanism when a teacher's request for approval of textual or supplementary materials has been denied. Worse, there is no procedure whatsoever for obtaining substantive approval of such materials. Brannian's memorandum to Fisher simply tells him to quit what he is doing. Brannian offers no guidance whatsoever. No written school board policy does, either.

If Policy 6160.1a is not unconstitutional on its face, a point I would not concede, it is unconstitutional as applied to Fisher in this case. None of the predicates for prior restraint of First Amendment rights have been established.